**Linda MICUS, Plaintiff–Appellant,**

**v.**

**Otis R. BOWEN, Secretary of Health and Human Services, Defendant–Appellee.**

**No. 91–3407.**

United States Court of Appeals, Seventh Circuit.

Argued April 29, 1992.

Decided Nov. 12, 1992.

Before CUMMINGS and COFFEY, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

HARLINGTON WOOD, Jr., Senior Circuit Judge.

Linda Micus appeals from the order of the district court affirming the Secretary of Health and Human Services' ("Secretary") denial of her application for disability benefits under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 416(i), 423(d). We reverse and remand with instructions to the Secretary to grant benefits.

## I. BACKGROUND

In June 1977 Linda Micus was diagnosed as having systemic lupus erythematosus ("lupus"). Lupus is a chronic, relapsing inflammatory disease that attacks connective tissues and is characterized by a wide range of symptoms, including arthritis, pain in the joints, kidney and blood disorders, skin eruptions, and fever. *Dorland's Illustrated Medical Dictionary* 958 (27th ed. 1988).

Although lupus is incurable and its cause unknown, medication can, at least temporarily, moderate its effects on many sufferers. For example, the anti-inflammatory corticosteroid, Prednisone, which was used to treat Ms. Micus, is commonly effective. Lastly, as a chronic disease lupus may lie dormant or quiescent, exhibiting no or slight manifestations, only to flare suddenly and debilitatingly.

Ms. Micus applied for Social Security disability benefits on two different occasions, but the Secretary denied both petitions. She appeals the denial of her second petition. Ms. Micus filed her first petition in September 1978, but it was denied initially and also on administrative review, January 22, 1979. She sought no further review, either administrative or judicial. Consequently, that petition is not at issue here, and she is not eligible for disability benefits before that date.

Harlan M. Noel, James Balanoff (argued), Munster, Ind., for plaintiff-appellant.

Gwenn R. Rinkenberger, Orest S. Szewciw, Asst. U.S. Attys., Dyer, Ind., George Jackiw (argued), Dept. of Health and Human Services, Region V, Office of the General Counsel, Chicago, Ill., for defendant-appellee.

Ms. Micus filed her second petition on January 30, 1985, although the last day of her insurance coverage under the Act had been December 31, 1983. Therefore, she had to demonstrate she met disability criteria at or for the appropriate time during the period 1979 through 1983; nevertheless, the Secretary accepted relevant testimony and medical data through 1985 as relating back to her pre-1984 condition. This petition, too, was denied.

After a series of unsuccessful administrative appeals, Ms. Micus was granted a hearing before an Administrative Law Judge ("ALJ"). The hearing took place on September 25, 1985, and the ALJ denied her petition on December 23, 1985. Her subsequent request for review was denied by the Appeals Council. Thus, the Secretary's decision became final, and she sought recourse in the United States District Court for the Northern District of Indiana.

In a strongly and, we think, appropriately worded opinion, Chief Judge Sharp criticized the ALJ for his interpretation of the medical evidence. *Micus v. Bowen*, No. 86 C 510, Order on Cross-motions for Summary Judgment at 6 (N.D.Ind. Aug. 9, 1991). Chief Judge Sharp, nonetheless, "very reluctantly conclude[d]" that recent decisions of this court mandated that the Secretary's denial of benefits be affirmed. *Id.* at 5.

A timely appeal was filed; thus, we have jurisdiction.

## II. STANDARD OF REVIEW

The Social Security Act both empowers and constrains a reviewing court. On one hand, the Act gives a court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). On the other hand, the Act clearly states that the "findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." *Id.*

As we are reviewing a factual determination made by the Secretary, and not the district court, we too must apply the "substantial evidence" standard, and not the clearly erroneous standard of Federal Rule of Civil Procedure 56(a). *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir.), *cert. denied*, 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986).

In *Ehrhart v. Secretary of Health & Human Services*, 969 F.2d 534 (7th Cir. 1992), we recently elaborated what this standard of review means:

> Substantial evidence means " 'more than a mere scintilla' " of proof, instead requiring " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " In our reviewing capacity, however, we may not reweigh the evidence or decide whether a claimant is disabled. Nor may the court substitute its own judgment for that of the Secretary. By the same token, we must do more than merely rubber stamp the decisions of the Secretary.

*Id.* at 538 (citations omitted); *accord Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Anderson v. Sullivan*, 925 F.2d 220, 222 (7th Cir.1991); *Farrell v. Sullivan*, 878 F.2d 985, 988 (7th Cir.1989); *Steward v. Bowen*, 858 F.2d 1295, 1297 (7th Cir.1988). With this standard in mind, we review the proceedings below.

## III. ANALYSIS

In reaching his decision on whether to grant disability benefits, the ALJ had numerous parcels of evidence to consider. Both Ms. Micus, who was represented by counsel, and her husband, Daniel Micus, testified at the hearing. Ms. Micus stated she was born March 13, 1952, in Chicago and graduated from high school. She was married, had two sons, three and six years old, respectively, and lived in Whiting, Indiana. Since 1970, she had worked mostly as a secretary but had been forced to stop in December 1978 because of arthritis, fatigue, weakness, pain in her joints, especially her knees and fingers, and pain in her legs and back.

Ms. Micus testified that because of sore throats and fever her physician at the time admitted her to South Chicago Community Hospital in May 1977. She spent three weeks in that hospital, was initially treated with massive doses of intravenous penicillin and, later, aspirin, and was diagnosed as possibly having cat-scratch fever. At Ms. Micus's request she was transferred on June 9th to Mercy Hospital, Chicago. Medical records show that, upon admission, she exhibited a butterfly rash on her face, arthralgia (joint pain), leukopenia (reduction in the number of leukocytes (white blood cells) commonly accompanied by increased susceptibility to infection, resulting, for example, in sore throat, fever, nasal congestion, and ear problems), tachypnea (rapid breathing), tinnitus (ringing in the ears), hearing problems and nasal congestion. She was tentatively diagnosed as having systemic lupus erythematosus. Subsequent tests confirmed that diagnosis and showed she was also suffering from salicylate (aspirin) intoxication. Aspirin was discontinued; Prednisone was prescribed; and she left the hospital June 18th.

The substance of the rest of Ms. Micus's testimony is that she was constantly in some sort of joint pain, always tired, frequently nauseous, and unable to work or be gainfully employed, to do much housework at all, to care for her children, to lift a gallon-container of milk, or to shop other than for the occasional loaf of bread. Her husband's testimony essentially corroborated hers. He added that she often needed help dressing and undressing and that when she was unable to climb the stairs at home in the evening because of weakness or the pain, she would sleep downstairs on the couch.

There were also forty-four exhibits. These included the records of Ms. Micus's treating physicians, Nancy L. Furey, M.D., and Warren W. Furey, M.D., and records from the hospitalization in June 1977 when her lupus was first diagnosed, a subsequent hospitalization in late June and early July 1985 for a flare-up of acute lupus, and hospitalizations in September 1979 and May 1982 for successful childbirth, both by cesarean section. These records show she was treated primarily with Prednisoné, Bufferin, at times with Indocin (a nonsteroid, anti-inflammatory drug), and Valium.

One of the exhibits, accepted by the ALJ for consideration after the hearing, is a letter from Dr. Warren Furey, dated October 10, 1985, describing the status of Linda Micus's lupus from June 1977 through 1985. In the letter Dr. Furey reviewed the laboratory and clinical evidence for Ms. Micus's having lupus, the disease's effects on her, and the up and down course of her disease. The doctor concluded:

> Linda continued to function during the 1977 through 1984 period, mostly through determination. She wanted children and she had them in spite of potential problems to herself. I know that at times her illness and the stress that it placed on herself and her husband caused marital difficulties and significant emotional stress as well. I did not intend to express an opinion when I started this dictation but having reviewed the chart as I have, I feel that Linda Micus indeed probably was disabled from the lupus from the time of onset.

█ No health-care provider or expert witness testified at the hearing. Thus, the ALJ had to rely solely on his own technical expertise to understand the medical records and to resolve both evidentiary and interpretive conflicts. The ALJ resolved these conflicts against Linda Micus. While the ALJ concluded that Ms. Micus did have lupus, he nonetheless discredited her testimony on the effects she suffered and the extent of her lupus.

First, the ALJ found the Micuses' testimony was not credible. He found, for example, treatment records indicated Ms. Micus had visited her physicians, Drs. Nancy and Warren Furey, less frequently between 1977 and 1985 than she had testified. The ALJ, however, erred in this finding and in using it as a basis for diminishing Ms. Micus's credibility.

The hearing transcript reveals that after Ms. Micus testified she had seen Dr. Nancy Furey "approximately two times a year," the ALJ responded, "So, Nancy Furey

would have her own records of the two or three times a year that you see her, is that right?" We are not told why "approximately two" means "two to three" rather than, say, "one to two." Similarly, after testifying to seeing Dr. Warren Furey "maybe four or five times a year, six times a year," the ALJ responded, "So, altogether you're seeing them perhaps eight or nine times between the two of them, for the Lupus, is that right?" Thus, where she had actually testified to seeing her physicians approximately six to eight times a year, the ALJ reported her testimony was that she had seen them eight to eleven times a year. This purported discrepancy, engendered in part by the hearing officer himself, and being trivial at most, is not the sort upon which credibility diminutions properly sound.

The ALJ also discredited Ms. Micus's claim of suffering continuously from 1977 with joint pain, fatigue, swelling in her fingers, and nausea because, according to her physicians' records, Ms. Micus more often than not told them she "felt good" or the like. Micus argues the ALJ relied on an inappropriate, commonly subjective criterion—a social pleasantry—to establish an objective fact. We agree that many factors may interact to elicit a response that one feels well and that this response, without adequate analysis, cannot be taken as objective evidence that the respondent is not disabled.

A quadriplegic, for example, may "feel well" or may "feel good" but be unequivo-cally disabled; whereas, someone with the common cold may report "feeling terrible" but be mostly able to perform his or her usual and customary work. Conversely, one who is disabled may indeed feel bad, and one who is not may feel well. Treatment notes of January 2, 1980, illustrate the paradox well: Dr. Warren Furey wrote, "Feels pretty good. Hands, knees, ankles, wrists—worse in a.m.," and then prescribed Prednisone, 20 mg every other day, Bufferin four times a day, and Valium. Accordingly, we find the ALJ erred in relying on Ms. Micus's statements reported in her physicians' records that she felt well or the like, because there is neither an analysis of these statements' relevance nor an analysis of objective criteria for determining disability in spite of what is described as her positive, cheerful attitude.[1]

A third inconsistency, also an evidentiary conflict resolved against Ms. Micus, typifies the problem of relying on third-party, out-of-court statements in the absence of clarifying or explanatory testimony. On June 29, 1985, Ms. Micus entered Northwestern Memorial Hospital with a diagnosed "acute flare up of systemic lupus erythematosus" and Salmonella enteritis. She was discharged July 3, 1985. The discharge summary, dictated by a Dr. M. McCormick, included the following statement in the section denominated History of Present Illness: "The patient initially presented with arthralgias and rash 8 years prior to admission, but the disease had been quiescent for approximately 6 years

1. In a letter addressed to Ms. Micus's attorney, dated April 28, 1986, and considered by the Appeals Council of the Social Security Administration, Dr. Warren Furey wrote:

I agree with you that Linda has been disabled, probably from the time I first met her and I am extremely sorry that my letter does not reflect that. I have discussed it with Dr. Nancy Furey, who as you know is also responsible for a large part of Linda's care. We feel that the problem with my letter and my office records is really the problem with Linda. Linda is a noncomplainer who tolerates a great deal of pain. She has never admitted that she didn't feel well. She was always willing to smile, to laugh, to tease. She is a truly wonderful lady with a very upbeat personality. It took high fevers and obvious evidence of blood in the urine, protein in the urine, formed elements in the urine, before she would admit she was sick. Even then, on absolutely maximum doses of Prednisone, she continued to present her pleasant, smiling, "feeling good" attitude. I will have to admit I was surprised when the kidney biopsy showed as advanced disease as it did.... She is ... a significantly ill young lady. I believe that she has truly been disabled since I first met her.... It is only her personality, vivaciousness and attitude that made the chart sound as though she was not so significantly sick.

The ALJ did not, of course, have access to this letter, nor did the physician testify to these "facts." We may not speculate on the results had this information been presented at the hearing, nor may we use it now to find reversible error.

until 2 months prior to admission." The ALJ used this statement to discredit both the testimony of Ms. Micus and the conclusion of Dr. Warren Furey on October 10, 1985, that "Linda Micus indeed probably was disabled from her lupus from the time of its onset."

Dr. McCormick apparently had not seen or treated Ms. Micus before her June 29th admission; thus, his statement was not based on firsthand knowledge. The source and authenticity of Dr. McCormick's statement about Ms. Micus's lupus having been quiescent and asymptomatic was questioned by the ALJ and addressed by her attorney at the hearing. Ms. Micus expressly testified that she never told Dr. McCormick or anyone else at Northwestern Memorial Hospital that her lupus had been quiescent and without symptoms for the six years before her admission. She also testified:

> I told him that the leg pains are something new that had started, the fever was something new. You know, where I had fevers all along with sore throats with Lupus, that this 103 fever was something new and that was the reason that I was in and that I felt better before I was in—but I think he just took it and turned it around.

Dr. McCormick did not testify. There is no record of his providing either an affidavit or answers to an interrogatory, and we do not know if either was sought. Consequently, the source of the statement and its accuracy remain mysteries.

In *Stephens v. Heckler*, 766 F.2d 284 (7th Cir.1985), we commented that, "When experience backed by observation is set against the 'speculative statement' of a consulting physician, substantial evidence lies on the side of the treating physician." *Id.* at 288 (citation omitted). The ALJ erred in rejecting the opinion of Dr. Furey, a physician who had experience backed by observation, in favor of Dr. McCormick, a doctor who saw the claimant only once and merely speculated as to her past condition. *See also Allen v. Weinberger*, 552 F.2d 781, 786 (7th Cir.1977) (opinion of treating physician entitled to greater weight than impression of doctor who sees claimant only once). *But cf. DeFrancesco v. Bowen*, 867 F.2d 1040, 1043 (7th Cir.1989) (criticizing *Allen* for not recognizing potential bias of treating physician).

Given the errors outlined above, it is easy to understand why Chief Judge Sharp was "greatly disturbed by the manner in which this ALJ may have taken undue liberties with the factual evidence." *Micus*, Order on Cross-motions for Summary Judgment at 7. Chief Judge Sharp, moreover, felt the ALJ's "findings have the appearance of the ALJ superimposing his medical opinion for that of the treating physician."[2] *Id.* at 6.

The judge, however, believed "the most recent statements in this circuit" forced the district court "with greatest reluctance, to stay its hand and to affirm the Secretary." *Id.* at 7–8. Specifically, Chief Judge Sharp felt earlier law that dealt with the respect to be afforded the uncontested opinion of the treating physician had been modified by *Reynolds v. Bowen*, 844 F.2d 451 (7th Cir.1988), and *Stephens*, 766 F.2d at 284.

As the judge noted, and as the Secretary pointed out in his brief, in *Stephens* this court recognized that a claimant's treating physician may be biased in favor of the claimant; bias that a consulting physician may not share:

> The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability. The regular physician also may lack an appreciation of how one case compares with other related cases.

---

2. The judge's concern about the ALJ's medical opinions finds support in the transcript of the administrative hearing. For example, when asked by Ms. Micus, "Once you get arthritis, isn't that with you the rest of your life?" the ALJ responded:

> Well, it can be—Rheumatoid arthritis does not necessarily consistently flare up. The word rheumatoid arthritis—I'm not so sure. You have a high sedimentation rate, I would imagine, and so it probably is related to that. It's similar to plain rheumatoid arthritis, but it goes along with—Again, rheumatoid arthritis can have periods of remission and Lupus itself is not a disease in every case that is consisting [sic] causing constant problems.

A consulting physician may bring both impartiality and expertise.

766 F.2d at 289; *DeFrancesco*, 867 F.2d at 1043.

Likewise, the district court and Secretary noted that in *Reynolds* this court opined that "while the treating physician's opinion is important, it is not the final word on a claimant's disability." 844 F.2d at 455. These observations are undoubtedly true, however it is necessary to understand the factual backgrounds against which they were made.

In *Stephens*, the claimant was injured on the job and thereafter sought disability benefits. In considering Mr. Stephens's claim, the ALJ had reports by at least eleven medical professionals—including three doctors to whom the ALJ had sent Mr. Stephens for evaluations. Supporting Mr. Stephens's position were his general practitioner and his chiropractor. Lined up on the other side were a resident in neurology at Indiana University and each of the three doctors to whom the ALJ had sent Mr. Stephens—one was an orthopedic surgeon, another a neurologist, and the third a chiropractor. 766 F.2d at 286–87.

The ALJ chose to believe the doctors adverse to Mr. Stephens's disability claim. On appeal, Mr. Stephens protested that the ALJ erred in not giving greater weight to the opinions of his general practitioner and chiropractor, doctors who were more familiar with his physical condition. *Id.* at 288. To buttress his opinion, Mr. Stephens quoted *Allen*. As we explained in our opinion in *Stephens*, however, *Allen* "does not hold that the report of a general practitioner controls whenever physicians disagree. The court held only that the ALJ must take into account the treating physician's ability to observe the claimant over a longer period." *Stephens*, 766 F.2d at 288.

We further noted, in the passage quoted by both the Secretary and Chief Judge Sharp, that a patient's regular physician may be biased in favor of the patient and may also fail to appreciate how his pa-

tient's case compares to others. In contrast, a "consulting physician may bring both impartiality and expertise." *Id.* at 289. In short, *Stephens* holds that it is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or that of the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence. *Id.*

■ Linda Micus's case is dissimilar to the claimant in *Stephens*. For one thing, the issue in *Micus* revolves around her past condition; in *Stephens*, the issue was the claimant's present condition. Whereas scores of doctors may examine a claimant's present condition, going back in time to examine the claimant's past condition is difficult for even the most talented consulting physicians. In such a case, the ALJ must take into account the treating physician's ability to observe the patient. *Id.* at 288; *Allen*, 552 F.2d at 786. In Ms. Micus's case, only the Drs. Fureys had the ability to observe the patient during the relevant time period, 1979–1983. Dr. McCormick's observation was made in 1985. Secondly, unlike *Stephens*, this is not a case of dueling doctors. This case does not involve experts with a thorough knowledge of a disease versus a perhaps parochial and biased general practitioner.[3]

As should now be apparent, *Stephens* does not obliterate earlier law in this circuit dealing with the respect which should be afforded the uncontested opinion of the treating physician. *Stephens*, after all, dealt with the respect due a *contested* opinion. Nor does *Reynolds* stand for radical change.

*Reynolds* also featured a claimant appealing the denial of social security disability benefits. Mr. Reynolds, like Mr. Stephens and Ms. Micus, also contended the ALJ and district court erred in not giving more weight to his treating physician's

---

**3.** As the record reflects, Dr. Warren Furey is a graduate of Northwestern University Medical School, specializes in internal medicine and in-

fectious diseases, and is affiliated with the American Board of Internal Medicine.

opinion of disability. Mr. Reynolds's physician, however, apparently gave an equivocal assessment of his client's status. 844 F.2d at 455 (Reynolds suffered "only slight muscular loss."). Most importantly, and most unlike the situation in the case before us, the claimant's own testimony contradicted his doctor's diagnosis of disability.

Before the ALJ, Mr. Reynolds testified that he worked in his garden, helped with household chores, cut the grass with a push lawn mower, drove a car, belonged to a scuba diving club, participated in underwater search and recovery operations for local law enforcement agencies, and on the day before his hearing with the ALJ "went on an expedition to pick bittersweet." *Id.* In this context, where the testimony of the claimant and his treating physician combine to make a cacophony, rather than a harmony, it is apparent that the doctor's opinion "is not the final word on a claimant's disability." *Id.* Such discordance, however, is not found in the present case.

It should be understood that *Reynolds* and *Stephens* do not create a presumption of bias in a treating physician's disability opinion; the cases recognize only the ALJ's ability as a trier of fact to consider a physician's possible bias. *Cf. Walker v. Bowen,* 834 F.2d 635, 641 (7th Cir.1987) (credibility determinations reserved to ALJ who can observe witnesses). The ability to consider bias, however, is not synonymous with the ability to blithely reject a treating physician's opinion or to discount that physician's opportunity to have observed the claimant over a long period of time. *Reynolds* and *Stephens,* moreover, do not change the requirement that the ALJ's findings be supported by substantial evidence; a requirement we believe the ALJ has failed to meet in this case.

As noted before, Chief Judge Sharp was very unhappy with the ALJ's interpretation of the factual evidence; the judge, however, felt constrained by prior opinions of this court and therefore "with greatest reluctance" affirmed the Secretary's denial of benefits. Having harmonized those recent opinions with longstanding precedent, we reverse the court below and do what Chief Judge Sharp thought should be done in the first place—we direct the Secretary to grant Ms. Micus the benefits to which she is statutorily entitled.

## IV. CONCLUSION

After having examined the record of the proceedings below, we determine there was not substantial evidence supporting the ALJ's denial of benefits. Accordingly, we reverse and remand with instructions to the Secretary to grant benefits.

REVERSED.