114 F.3d 1191
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Vincent E. MONT, Plaintiff-Appellant,
v.
Shirley S. CHATER, Commissioner of Social Security,
Defendant-Appellee.
 No. 96-2896.
 United States Court of Appeals, Seventh Circuit.
 Argued April 4, 1997.
Decided April 17, 1997.
 
 Before CUMMINGS, EVANS and DIANE P. WOOD, Circuit Judges.
 
 ORDER
 
 1
 Vincent E. Mont applied for Disability Insurance Benefits and Supplemental Security Income on April 9 and March 12, 1993, alleging that he became disabled on April 5, 1992. The Appeals Council refused to review the Administrative Law Judge's unfavorable decision on March 8, 1995. Plaintiff subsequently filed a complaint for judicial review on May 8, 1995. Cross-motions for summary judgment were filed by the parties and on July 15, 1996, the district court denied plaintiff's motion for summary judgment and granted the motion to affirm filed by the Commissioner of Social Security. Based on the well-reasoned attached order of the district court, the judgment is affirmed.
 
 ATTACHMENT
 UNITED STATES DISTRICT COURT
 CENTRAL DISTRICT OF ILLINOIS
 
 2
 Vincent E. Mont, Plaintiff,
 
 
 3
 v.
 
 
 4
 Shirley S. Chater, Commissioner of Social Security, Defendant.
 
 Case No. 95-1186
 
 5
 July 15, 1996.
 
 ORDER
 
 6
 This matter is before the Court on Vincent E. Mont's Motion for Summary Judgment [# 13], the Commissioner's Motion to Affirm [# 14], and Mont's Petition for Attorney's Fees [# 12]. For the reasons set forth below, Mont's Motion for Summary Judgment and Petition for Attorney's Fees are DENIED, and the Commissioner's Motion to Affirm is GRANTED.
 
 Procedural Background
 
 7
 Vincent E. Mont appeals to this Court the final decision of the Commissioner of the Social Security Administration denying him Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act ("Act"). This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).
 
 
 8
 On March 12, 1993 and April 9, 1993, Mont applied for SSI and DIB, respectively. (Record ("R") at 22-26). On July 7, 1993, both applications were denied. Id. at 27-34. On July 27, 1993, Mont timely filed a request for reconsideration, which was denied on September 28, 1993. Id. at 35-41. On November 3, 1993, Mont filed a request for a hearing by an Administrative Law Judge ("ALJ"). Id. at 42-43.
 
 
 9
 On May 25, 1994, a hearing was held before ALJ Peter J. Caras. Id. at 213. Mont, George Weber (Mont's counsel), Gary Smith (an alcohol counselor and Mont's friend), and Stephanie Schlister (a Vocational Expert ("VE")), made appearances at the hearing. Id. at 213-14, 236.
 
 
 10
 On October 6, 1994, the ALJ entered a decision against Mont. Id. at 12-16. On November 23, 1994, Mont requested a review of the ALJ's decision by the Appeals Council. Id. at 7. On March 8, 1995, the Appeals Council denied the request, thereby making the ALJ's decision the final decision of the Commissioner. Id. at 4-5. On May 8, 1995, Mont initiated this civil action for judicial review of the Commissioner's final decision [# 1].
 
 Factual Background
 
 11
 Mont was born on December 11, 1936. Id. at 216. At the time of the hearing before the ALJ, he was 57 years old. Id. He is twice divorced, lives alone, and has a high school diploma. Id. at 124, 217.
 
 
 12
 He has held numerous jobs. Prior to 1968, he worked for 15 years as a truck driver, 1 year as a school bus driver, and 1 year at a theater. Id. at 67, 207. From 1968 to 1980, he worked at Eby Brown as a truck driver. Id. He was fired from this job. Id. at 207. From 1980 to 1986, he worked for Aurora Iron & Metal performing yard work and driving trucks. Id. at 67, 207. He was fired from this job as well. Id. at 207. In 1986, he worked for Dominick's performing maintenance and bagging. Id. at 67, 207. He quit this job. Id. at 207. In 1987, Mont worked for five months at Afinson Plastics as a packager. Id. at 67, 207. He was fired from this job for failing to notify his employer that he was not coming into work because he was sick. Id. at 219. In 1990, he worked for Finishes Unlimited performing maintenance work. Id. at 207. He was fired from this job. Id. In the summer of 1991, he worked for Tradesman Supply performing maintenance. Id. at 55. This job ended due to a low volume of business and Mont's drinking habits. Id. In 1992, he worked for three months at CCS Printing, where he loaded stacks of paper onto skids. Id. at 55, 67, 206. Mont gave conflicting reasons for leaving: the job was temporary, he was fired for having alcohol on his breath, and he "blew up" and got into an argument. Id. at 55, 206, 220. Mont's last regular job was at Tad Technical, where he worked as a laborer. Id. at 55. Mont indicated both that the job was temporary and that the job ended because of his drinking. Id. From the time of his last regular job to the time of the hearing in May 1994, Mont performed a number of odd jobs, including cleaning, laundry, repairs, and yard work. Id. at 60-61, 64, 187.
 
 
 13
 Mont has a long history of alcohol abuse stretching back to the 1960's. Id. at 187. In 1984, 1987, and 1993, he was arrested for driving under the influence of alcohol. Id. at 178, 188. In 1980, he entered the alcohol treatment program at the Mercy Center for Health Care Services ("Mercy"). Id. at 116. In April and December of 1984, he was admitted to Mercy due to his alcohol use. Id. at 112, 116. From January 18, 1985 to February 18, 1985, Mont was admitted to Mercy, again because of his alcohol abuse. Id. at 109. Dr. J.A. Wolfson, the doctor who treated Mont while he was at Mercy, assessed that Mont had poor self-esteem, would "binge" with alcohol, continued to work, and improved during treatment. Id. On February 6, 1985, during Mont's hospital stay, Dr. Wolfson ordered a psychological examination. Id. at 110. In Mont's psychological evaluation, the reviewing psychologist, Diane Corbin, reported that Mont was working for Aurora Iron & Metal as a truck driver but had been threatened with discharge unless he sought help for his drinking problem. Id. at 112-13. Corbin reported that Mont arrived for admission sober and seemed "self-motivated." Id. at 113.
 
 
 14
 From February 20, 1985 to May 8, 1985, Mont attended twelve of Mercy's after-care outpatient sessions. Id. at 144-55. Although Mont's first outpatient report states that he did not attend his AA meetings and did not exhibit self-motivation, later reports indicate that he made good progress. Id. By his final session, Mont was reported as attending AA three times each week, having a more positive attitude, and having made "much progress." Id. at 144. In 1989, Mont was admitted to Turning Point in Aurora, Illinois, where he completed Phase I of the Intensive Outpatient Treatment Program. Id. at 157.
 
 
 15
 In April 1992, Mont was admitted to the Sherman Hospital for chemical detoxification. Id. at 158. Dr. J. Naidu reported Mont as having stated that he had remained sober for a year or two after undergoing rehabilitation four years earlier in Aurora (presumably at Turning Point). Id. at 160. Dr. Naidu reported that Mont completed detoxification without complications but decided to leave before completing the program. Id. at 159.
 
 
 16
 In June 1993, the Illinois Department of Rehabilitation Services Bureau of Disability Determination Services evaluated Mont. Id. at 185-92. The two examiners, Gene Whitney ("Whitney") and Leo Meagher ("Meagher"), found that Mont had an alcohol dependency problem and problems with stress, depression, and normal relationships. Id. at 190. Whitney and Meagher recommended further inquiry into areas other than Mont's alcohol abuse. Id. at 191. They based this recommendation on the fact that Mont's recurring alcohol abuse hinted at other possible, underlying problems. Id.
 
 
 17
 On June 9, 1993, Dr. M.C. Heinze, a clinical psychologist, examined Mont. Id. at 172. Mont stated to Dr. Heinze that he worked part-time mowing lawns for cash, as well as kept up the yard at the house in which he lived in exchange for not paying rent. Id. at 172-73. Mont also stated that he prepared his own meals, paid his own bills, cared for his dog and cat, and did his own shopping. Id. at 172-74. Dr. Heinze reported that Mont said he "got along" well with others and maintained friendships and that Mont showed no restrictions in interests and daily activities. Id. Dr. Heinze concluded that Mont's alcoholism was in remission and that he could perform routine, repetitive tasks of a work-related nature, preferably in a slow-paced job situation. Id. at 174.
 
 
 18
 At the hearing in May 1994 before the ALJ, Mont stated that he had gotten along well with others when he worked, including co-workers and supervisors. Id. at 224. He also indicated, however, that he does not take criticism well. Id. at 232. Mont stated that when his employer began "yelling and hollering at" him, he would "either tell them I got--I was sick and went home and just went and done something else." Id. He further testified that if someone said something to "T [him] off," he might "blow up" and "cause a big argument or something." Id. at 220. He testified that he prepares his own meals and does his own shopping, cleaning, household chores, and lawn work. Id. at 226. He stated that he drinks less than he used to and that the last time he drank alcohol was two weeks prior to the hearing. Id. at 221. Characterizing his drinking as "binging," Mont testified that he is unable to remember how much alcohol he drinks but that a "binge" usually lasts a week. Id. at 230. He also testified that he never missed work because of drinking, although he was fired for alcohol-related reasons three, four, or more times. Id. at 224, 231.
 
 
 19
 Gary Smith, an alcohol counselor and Mont's friend, testified that Mont's drinking was in remission in 1993, but that Mont has resumed drinking since that time. Id. at 234. Smith first met Mont in 1989, and he characterized Mont's drinking since that time as being "on occasion" and "[m]ore episodic that's on a--we'll say like a weekender." Id. at 235. Smith also testified that since 1989, he has never seen Mont sober for more than six months. Id. at 236.
 
 
 20
 Shortly thereafter, the ALJ asked the VE the following hypothetical question:
 
 
 21
 Assume a hypothetical claimant 57, high school diploma, no exertional limitations, but limited to unskilled work. Simple, routine, tasks, not regard as very stressful, not requiring significant memorization. Occasional deficiencies of concentration and attention. Occasional contact with co-workers, public, and supervisors, that's it. What affect on the past work?
 
 
 22
 Id. at 239-40. The VE responded that "packager and bagger and laborer could still be performed." Id. at 240. She indicated that, according to the DICTIONARY OF OCCUPATIOAL TITLES ("DOT "), packager and bagger are medium-duty, unskilled jobs and that laborer is a heavy-duty, unskilled job. Id. at 205, 240. She stated that the hypothetical claimant can also perform the job of garbage collector, a heavy-duty, unskilled job. Id. at 240. The VE testified that unskilled jobs have very little stress, unless the job is unskilled service work involving more than occasional contact with the public. Id. at 243. The VE also stated that the hypothetical claimant's restriction to occasinal contact with people would prevent him from performing "a lot" of light-duty, unskilled jobs. Id.
 
 Discussion
 
 23
 In order to be entitled to disability benefits under SSI and DIB, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. See 20 C.F.R. §§ 404.1566, 416.966 (1986).
 
 
 24
 The establishment of disability under the Social Security Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. McNeil v. Califano, 614 F.2d 142, 143 (7th Cir.1980). That factual determination is made by using a five-step test. See 20 C.F.R. §§ 404.1520, 416.920.
 
 
 25
 The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed?' (2) is the plaintiff's impairment "severe?" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments? (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation?; and (5) is the plaintiff unable to perform any other work within the national economy?
 
 
 26
 An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. Garfield v. Schweiker, 732 F.2d 605 (7th Cir.1984).
 
 
 27
 The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. Tom v. Heckler, 779 F.2d 1250 (7th Cir.1985); Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir.1984).
 
 
 28
 The Court's function on review is not to try the case de novo or to supplant the ALJ's finding with the Court's own assessment of the evidence. Pugh v. Bowen, 870 F.2d 1271 (7th Cir.1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir.1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504 (1985); Imani v. Heckler, 797 F.2d 508 (7th Cir.), cert. denied, 479 U.S. 988, 107 S.Ct. 580 (1986).
 
 
 29
 I. Substantial Evidence Supports the ALJ's Decision
 
 
 30
 A. Substantial Evidence Supports the ALJ's Residual Functional Capacity ("RFC") Finding
 
 
 31
 First Mont argues that the ALJ did not minimally articulate his reasons for crediting or rejecting evidence of disability and that the "overwhelming weight" of the evidence in the record favors Mont. (Motion for Summary Judgment ("MSJ") at 12). An ALJ must minimally articulate his reasons for crediting or rejecting evidence of disability. Scivally v. Sullivan, 966 F.2d 1070, 1076 (7th Cir.1992). "The requirement that the ALJ articulate his consideration of the evidence is deliberately flexible." Stein v. Sullivan, 966 F.2d 317, 319 (7th Cir.1992). Only a minimal level of articulation by the ALJ as to his assessment of the evidence is necessary. Id. at 320. Furthermore, the credibility assessments of an ALJ "are entitled to considerable deference." Steward v. Bowen, 858 F.2d 1295, 1302 (7th Cir.1988). A court "may not reweigh the evidence ... or reconsider credibility determinations unless those determinations are patently wrong." (Citation omitted.) Wolfe v. Shalala, 997 F.2d 321, 326 (7th Cir.1993); see Kelly v. Sullivan, 890 F.2d 961, 965 (7th Cir.1989) (stating that a court must affirm an ALJ's assessment of credibility unless it is "patently wrong").
 
 
 32
 The ALJ found that Mont has an unlimited RFC. (R15). The ALJ determined that Mont requires unskilled work which involves simple, routine tasks which are not very stressful, do not require significant memorization, and require only occasional contact with co-workers, the public, and supervisors. Id. Additionally, the ALJ found that Mont's ability to abstain from drinking suggests that Mont is not completely dependent upon alcohol. Id. at 14. The ALJ found no reason why Mont could not resume his work as a bagger or packager. Id. at 15.
 
 
 33
 The ALJ outlined several sources of support for his decision within the record. Id. at 14. Dr. Heinze's report indicates that Mont's alcoholism was in remission in 1993 and that he is able to follow directions well enough to perform routine, repetitive tasks in a slow-paced, low-stress job. Id. at 14, 174. The record and Mont's testimony indicate that Mont is able to abstain from alcohol for extended periods of time. Id. at 14, 172, 177, 183, 221, 234, 236. The record and Mont's testimony also indicate that Mont lives alone and is able to perform all the activities of daily living. Id. at 14, 225-28. These activities include reading the newspaper, mowing the lawn, shoveling snow, doing laundry, preparing meals, shopping for groceries, working with wood, vacuuming, sweeping, and paying bills. Id. at 14, 172-74, 226-28. The record further indicates that Mont has had problems with alcohol dating back to at least the 1960's. Id. at 187. Until 1992, however, he was able to find employment and continued to work at the time of the hearing mowing lawns for cash and maintaining the yard where he lives in exchange for not paying rent. Id. at 172, 207.
 
 
 34
 The ALJ more than minimally articulated reasons for his decision. Although there is evidence in the record contrary to the ALJ's decision, a reasonable mind may find the evidence outlined by the ALJ adequate to support his decision, thus precluding a finding that his conclusions are patently wrong. See Kapusta v. Sullivan, 900 F.2d 94, 96 (7th Cir.1989) (characterizing substantial evidence as " 'such evidence as a reasonable mind might accept as adequate to support a conclusion' "); Stephens v. Heckler, 766 F.2d 284, 288 (7th Cir.1985) (upholding an ALJ's decision because his decision provided a "logical path to a conclusion supported by substantial evidence").
 
 
 35
 Mont next argues that Gary Smith's testimony should be given controlling weight due to the "treating physician" rule. (MSJ at 13). Mont claims that because Smith knew him for a number of years, Smith's testimony should be given more weight than Dr. Heinze's report because Dr. Heinze met with him only once. Id. Smith, however, is not a physician; he is an alcohol counselor with two bachelor of science degrees. (R233). Nevertheless, Smith's opinion could be characterized as a medical opinion from a treating source. See 20 C.F.R. §§ 404.1527, 416.927 (defining medical opinions as "statements from physicians and psychologists or other acceptable medical sources").
 
 
 36
 Even if Smith's opinion were to be characterized as a medical opinion from a treating source, the law does not require an ALJ to accord a treating source's opinion more weight than a consulting physician's opinion. Micus v. Bowen, 979 F.2d 602, 608 (7th Cir.1992); see also 20 C.F.R. § 404.1527(d)(2), 416.927(d)(2) (indicating that a treating source's opinion will only be given controlling weight when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] ... record ..."). Indeed, although a treating physician may have the ability to observe a claimant over a longer period of time than a consulting physician, a claimant's regular physician may also desire to do a favor for a friend and client and "too quickly find disability." Stephens, 766 F.2d at 289. The decision on the weight of medical testimony ultimately rests with the judgment of the ALJ. Micus, 979 F.2d at 608.
 
 
 37
 Given the admitted friendship between Smith and Mont, the ALJ need not have accorded Smith's testimony more weight than the report by Dr. Heinze, a consulting physician. Assuming Smith's testimony should have been accorded more weight than Dr. Heinze's report, Mont's position is still unimproved. Smith's testimony corroborates the ALJ's decision in most respects and does not contradict it. (R234-36). Smith testified that Mont's drinking was in remission in 1993, that Mont can abstain from alcohol for six months, and that he and Mont are friends. Id.
 
 
 38
 Finally, Mont argues that the ALJ has inappropriately placed himself "into a physician's shoes" by concluding that Mont is not completely dependent on alcohol. (MSJ at 13). An ALJ's decision "must be based on testimony and medical evidence in the record." Rousey v. Heckler, 771 F.2d 1065, 1069 (7th Cir.1985). "The ALJ cannot make his own independent medical determinations about the claimant." Id. However, it is ultimately for the ALJ to decide whether a disability is present. See Kapusta, 900 F.2d at 96 (noting that the "final decision on whether a claimant is disabled or not is a legal one rather than a medical one, and it is for the ALJ to make that decision"). Even though a medical source may indicate a claimant has a disability, this does not mean that the ALJ must find the claimant has a disability. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).
 
 
 39
 The ALJ based his decision on the medical evidence in the record. (R13-15). First, Mont indicates on his Drug and Alcohol Use Questionnaire that he has gone at least two years without drinking alcohol. Id. at 59. Second, Gary Smith testified that Mont has gone six months without any alcohol use. Id. at 236. Third, Mont held numerous jobs despite his apparent alcohol problem. Id. at 55, 67, 207. Fourth, Dr. Heinze's report indicates that Mont's alcohol use was in remission in 1993. Id. at 172-74. This evidence is consistent with and supports the ALJ's finding that Mont is able to abstain from using alcohol for extended periods of time and is not completely dependent upon it. Id. at 14, 144-54, 172-74, 234-36. Thus, the ALJ did not "step into the physician's shoes" but, rather, properly relied upon the evidence in the record.
 
 
 40
 Accordingly, Mont's argument that the ALJ's determination of his RFC is not supported by substantial evidence is without merit. Mont's Motion for Summary Judgment is denied as to this argument.
 
 
 41
 B. Substantial Evidence Supports the ALJ's Past Relevant Work ("PRW") Finding
 
 
 42
 1. The ALJ's Hypothetical Question Was Proper
 
 
 43
 Mont argues that the ALJ's hypothetical question is misleading, biased, and incomplete in that it fails to present the VE with a full picture of Mont's impairment. (MSJ at 20). "All that is required for a hypothetical question to be proper is that the hypothetical question be supported by the medical evidence." (Internal quotation marks and citation omitted.) Ehrhart v. Secretary of Health and Human Services, 969 F.2d 534, 540 (7th Cir.1992). Furthermore, when the record supports the conclusion that the VE reviewed the medical reports and documents, his testimony is probative even if the hypothetical question does not take into account every aspect of the claimant's impairment. Id. at 540-41. Where a VE reviews the administrative record containing vocational and medical evidence, a reviewing court can conclude that the VE considered all of the claimant's impairments "even though all of those impairments were not specifically included in the ALJ's hypothetical question." Ragsdale v. Shalala, 53 F.3d 816, 820 (7th Cir.1995).
 
 
 44
 Although Mont claims limitations on attention and concentration were improperly left out of the hypothetical question, the Commissioner correctly points out that the hypothetical question in fact contains such limitations. (MSJ at 20; Motion to Affirm ("MTA") at 11; R239-40). While Mont also claims the hypothetical question should have contained references to anxiety and depression, Heinze's report indicates that Mont's mild depression does not limit him and that he can do a simple, routine job. (MSJ at 20; R172-74). Thus, the ALJ's omission of these characteristics from his hypothetical question is supported by the record.
 
 
 45
 Even if the ALJ's hypothetical question were incomplete, Mont concedes that such an incomplete hypothetical question would not be legally deficient as long as the VE had reviewed the record and was present at the hearing. (MSJ at 19). See Ehrhart, 969 F.2d at 540; Ragsdale, 53 F.3d at 820. Mont argues that "there is no evidence in the Record ... [to indicate] that the VE reviewed any medical records or other documents forming a part of the Administrative Record" and that the VE's presence during the entire hearing can only be inferred. (MSJ at 19-20).
 
 
 46
 As to whether the VE did, in fact, review the records prior to the hearing, the ALJ's letter to the VE indicates that "pertinent exhibits ... tentatively selected for inclusion in the record of this case" were sent to the VE prior to the hearing. (R193). In addition, the VE must have reviewed the record in order to prepare the table documenting Mont's work experience. Id. at 205. Some of those pertinent exhibits contain both vocational and medical information, thereby putting the VE on notice of any impairments which might prevent Mont from working Id. at 47-58. Furthermore, as the Commissioner argues, it is clear from the hearing transcript that the VE was present for the entire duration of the hearing. (MTA at 13; R215, 232-33, 239-45). Thus, even if the ALJ's hypothetical question were incomplete, it is still legally sufficient.
 
 
 47
 2. The VE's Reference to the ADA Did Not Taint Her Testimony
 
 
 48
 Mont also claims that the VE's assessment of his RFC is tainted by the VE's "impermissible and gratuitous interpretation of the Americans with Disabilities Act [ ("ADA") ]." (MSJ at 17). The issue of the ADA arose when Mont's attorney asked the VE to assume that the hypothetical claimant "shows up at work drunk ... once every two weeks." (R242). The VE responded by saying, "Yeah. Essentially under ADA alcoholism is protected." Id. Without citing to any authority, Mont argues that the VE's reference to the ADA tainted her entire testimony and since the ALJ in part relied upon the VE's opinion, the ALJ's decision is based upon an error of law. (MSJ at 17-18). The Commissioner argues that the ALJ did not rely upon the ADA. (MTA at 13).
 
 
 49
 A claimant has the opportunity to question the VE on cross-examination, pose hypothetical questions, ask the ALJ to pose interrogatories to the VE, and generally challenge the VE to explain and expand her opinions. Ragsdale, 53 F.3d at 819. A claimant's "failure to protect his own interests ... cannot constitute a sufficient ground for [a court] to cast aside a prior opinion." Id.
 
 
 50
 In this case, the VE's reference to the ADA was in response to a question on cross-examination posed by Mont's attorney. (R242). Mont's attorney did not ask the VE to clarify what she meant by her reference to the ADA or whether she relied on the ADA in her decision-making process. Id. at 241-49. Indeed, Mont's attorney did not inquire into the matter at all but, rather, moved on to the next line of questioning. Id. at 242-243. Mont failed to "protect his own interests" regarding mention of the ADA. Ragsdale, 53 F.3d at 819.
 
 
 51
 Furthermore, even if the VE had relied upon the ADA to make her findings, nothing in the record indicates that the ALJ relied upon the VE's remarks concerning the ADA. The ALJ never refers to the ADA in his decision. (R12-16). Indeed, in affirming the ALJ's decision, the Appeals Council made it clear that the ADA was not a consideration when it stated that "the ADA is not relevant to this case." Id. at 4. Thus, consideration of the ADA was not relevant, and Mont advances no support for his contention that improper reliance on the ADA occurred.
 
 
 52
 Mont also argues his due process rights were violated because he received no notice that the ADA would be discussed. (MSJ at 17). The ALJ is required to send advance notice to the claimant of an intention to examine a new issue. 20 C.F.R. § 404.946(b)(2). The ADA was brought into the hearing by the VE in response to a question posed by Mont's attorney. (R242). Neither Mont's attorney nor the ALJ pursued the matter. Id. at 239-45. The record indicates that the ALJ never examined the ADA as an issue. Id. at 239-40. Mont was not entitled to notice of a passing reference to a non-issue, and his due process rights could not have been violated.
 
 
 53
 3. The VE's Testimony Need Not Be Consistent with the DOT
 
 
 54
 Mont argues that the ALJ erred by not inquiring further into the nature of the duties performed by Mont in his PRW. (MSJ at 21). He argues that the testimony of the VE and the DOT conflict and that Mont is unable to perform the functions of packager and bagger. Id. at 21-23. The Commissioner argues that the ALJ properly relied upon the testimony of the VE, even if it conflicted with the DOT. (MTA at 15.)
 
 
 55
 There is no requirement that a VE's testimony correlate with information in the DOT, and when it does not, the Secretary gives "full consideration to all relevant facts in accordance with the definitions and discussions under vocational considerations." 20 C.F.R. §§ 416.969, 404.1569. See Whitehouse v. Sullivan, 949 F.2d 1005, 1007 (8th Cir.1991) (noting that an ALJ may "take administrative notice of any 'reliable job information ...' "). "The DOT' § requirements are not controlling and they are to be applied in light of the vocational expert's professional knowledge regarding one's ability to perform an identified job." Logan v. Shalala, 882 F.Supp. 755, 764 (C.D.Ill.1995); see Conn v. Secretary of Health and Human Services, 51 F.3d 607, 610 (6th Cir.1995) (referring to Sixth Circuit precedent as stating that "the ALJ may rely on the testimony of the vocational expert even if it is inconsistent with the job description set forth in the [DOT ]"); Barker v. Shalala, 40 F.3d 789, 795 (6th Cir.1994) (stating that "[i]t would be manifestly inappropriate to make the [DOT ] the sole source of evidence concerning gainful employment"). The ALJ was therefore justified in relying upon the expert testimony of the VE, even if it were inconsistent with the DOT.
 
 
 56
 The VE's testimony, however, does not appear to be inconsistent with the DOT. The VE testified that Mont can perform his PRW of bagger and packager. (R240). The DOT indicates that "[a] packager should be able to add and subtract two digit numbers [and] [m]ultiply and divide 10's and 100's by 2, 3, 4, and 5." (MSJ at 22, quoting DOT, Supplement, Appendix C). Mont argues that the DOT requires mathematical skills for a packager which are beyond Mont's capabilities. (MSJ at 22). There is, however, ample evidence in the record that Mont can perform the requisite math skills of a packager. Heinze's report indicates that Mont is unable to subtract "7's from 100, but is able to add and multiply single digit numbers." (R173). Further, Mont manages his own finances. Id.
 
 
 57
 The DOT also indicates that a packager should have sufficient language skills to "recognize [the] meaning of 2,500 (2- or 3-syllable) words" and "[r]ead at a rate of 95-120 words per minute." (MSJ at 23, quoting DOT ). Mont testified that he reads the newspaper, has good interpersonal skills, and has no mental impairments. (R224, 227). Heinze reported that Mont was not restricted by any mental impairments. Id. at 173. The record also indicates that Mont performed the jobs of packager and bagger while concededly having problems with alcohol. Id. at 112. Thus, although the VE's testimony need not be consistent with the DOT, the record indicates that there is no significant conflict between the VE's findings and the DOT.
 
 
 58
 Additionally, Mont had an opportunity during the hearing to ask questions and elicit information from the VE on cross-examination. See Ragsdale, 53 F.3d at 819 (stating that cross-examination and other procedural safeguards exist to bring out the VE's thought process). Mont had an opportunity to cross-examine and question the VE concerning the basis of her findings, but he did not to do so.
 
 
 59
 Substantial evidence therefore supports the ALJ's PRW finding. Because both the RFC and PRW findings of the ALJ are supported by substantial evidence, Mont's Motion for Summary Judgment is denied as to these arguments.
 
 
 60
 II. Mont Was Not Deprived of Due Process of Law
 
 
 61
 " 'Due process' is such a ductile concept that phrase-dropping is the equivalent to no argument at all." Riggins v. McGinnis, 50 F.3d 492, 494 (7th Cir.), cert. denied sub nom., Riggins v. Washington, 515 U.S. 1163, 115 S.Ct. 2621 (1995). Indeed, "[i]t is not enough to scatter the words 'due process' in a brief." Id. Mont does not even articulate whether it is his procedural or substantive due process rights which have been violated. Further, Mont cites no authority in support of this allegation. Even if Mont's due process arguments were legitimate, his due process rights were not violated.
 
 
 62
 Mont argues that the ALJ deprived him of his due process rights by failing to explain to him why the VE was present at the hearing and what the VE's function was. (MSJ at 15). Mont was sent a document entitled "Notice of Hearing" instructing him as to what issues would be considered, what would happen at the hearing, and what rights he would have regarding objections to issues, submission of additional evidence, and requests for subpoenas. (R199-202). At the hearing, the ALJ stated that he would not "go into any detail about the issues or the role of participants" because Mont was represented by counsel. Id. at 215. At the hearing, neither Mont nor his counsel objected to the ALJ's premise, and neither asked for any explanations. Id. at 215. A claimant's failure to protect his interests is not a sufficient reason for a court to cast aside the ALJ's decision. Ragsdale, 53 F.3d at 819. Mont cannot now claim that his due process rights were violated.
 
 
 63
 Mont also claims his due process rights were violated because the ALJ interfered with Mont's attorney's cross-examination of the VE. (MSJ at 23). Mont argues that the ALJ deprived Mont "of his right to raise issues of fact, bias, or interest in order to clarify or impeach the VE's testimony." Id.
 
 
 64
 Mont's attorney asked the VE nine questions, at most. (R241-45). The ALJ interrupted the questioning and limited the scope of some of the attorney's questions. For example, in response to a question posed by Mont's attorney to the VE about stress, the ALJ interjected himself and said, "[Q]uestions are asked as ... functional limitations and how it would impact upon jobs or the numbers of jobs that are available." Id. at 243. The ALJ interjected himself because the question was improper. Id. at 244. Mont's attorney could have raised proper issues of fact, bias, or interest in order to clarify or impeach the VE's testimony. The ALJ did not terminate Mont's attorney's cross-examination. Id. at 241-45. Rather, Mont's attorney had an opportunity to raise appropriate issues and was only prevented from asking improper questions. Id.
 
 
 65
 Because Mont's cross-examination of the VE was not improperly interrupted by the ALJ and Mont was not improperly denied an explanation as to the function of the VE, his Motion for Summary Judgment is denied as to these arguments.
 
 III. Mont Is Not Entitled to a Remand
 
 66
 Mont claims this case should be remanded to further develop the record because he was deprived of a full and fair hearing because the ALJ failed to develop the issue of any possible psychological or mental impairments of Mont. (MSJ at 15.)
 
 
 67
 The ALJ has an obligation "to develop a full and fair record" of the administrative hearing. Smith v. Secretary of Health, Educ. and Welfare, 587 F.2d 857, 860 (7th Cir.1978). When the claimant is not represented by counsel, the ALJ has a higher duty to probe "scrupulously and conscientiously" into all relevant facts so that such facts become a part of the record. (Internal quotation marks and citations omitted.) Cannon v. Harris, 651 F.2d 513, 519 (7th Cir.1981).
 
 
 68
 At the hearing, the ALJ asked Mont about the effect alcohol has on his life. (R225). The ALJ asked Mont about his daily activities such as chores, hobbies, and friends. Id. The ALJ also asked Mont if he had ever received regular treatment from a psychiatrist or psychologist--a question to which Mont responded, "No." Id. at 227. Indeed, the ALJ directly asked Mont:
 
 
 69
 Any other problems mentally that you feel I should know about, or anything you want to tell me?
 
 
 70
 Mont responded, "No." Id. The record further indicates that Mont was never diagnosed with any mental or psychological impairments. Dr. Wolfson diagnosed Mont as having no "organic factors" affecting him and stated that any difficulty Mont has in seeing the relationship of behavior and its consequences may "be a function of his personality style." Id. at 110. Dr. Heinze reported that Mont has only mild depression and anxiety which does not limit him in any way and has no indication of hallucinations, delusions, or crying spells. Id. at 174. The only indication in the record of a possible mental problem is the report by Whitney and Meagher stating that some of Mont's behavior "hints" at a possible underlying problem. Id. at 191. Considering the numerous items in the record indicating Mont has no mental problems and Mont's negative response to the ALJ's direct question of whether he has mental problems, the ALJ sufficiently developed the record at the hearing. Furthermore, Mont's attorney could have produced evidence that Mont has a mental or psychological difficulty, but his attorney did not do so. The hearing was full and fair.
 
 
 71
 Additionally, although Mont requests this case be remanded, he fails to indicate what type of remand he is requesting. There are two types of remand: sentence four and sentence six of 42 U.S.C. § 405(g). Melkonyan v. Sullivan, 501 U.S. 89 (1991). See also Shalala v. Schaefer, 509 U.S. 292, 113 S.Ct. 2625, 2629 (1993) (stating that "the exclusive methods by which district courts may remand to the [Commissioner] are set forth in sentence four and sentence six of 405(g) ..."). Sentence four remand is appropriate when the Court wants the Commissioner to have a rehearing. See 42 U.S.C. § 405(g). Sentence six remand is appropriate only when there is "a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Id. Sentence six remand is available to a claimant who requests it and makes the appropriate showing. Eads v. Secretary of Dept. of Health and Human Services, 983 F.2d 815, 817 (7th Cir.1993).
 
 
 72
 There is no need for remand under sentence four because substantial evidence supports the ALJ's decision, thus negating any reason for a rehearing. This Court cannot remand Mont's case under sentence six because he fails to present new, material evidence and show good cause for his failure to present this new evidence earlier. Accordingly, Mont's attempt to request remand is DENIED.
 
 Conclusion
 
 73
 Accordingly, Mont's Motion for Summary Judgment [# 11] is DENIED. The Commissioner's Motion to Affirm [# 13] is GRANTED. Mont's Petition For Attorney's Fees [# 12] is DENIED. This case is terminated.
 
 
 74
 /S/ MICHAEL M. MIHM
 
 MICHAEL M. MIHM
 Chief United States District Judge