**Barbara J. FLAHERTY, Plaintiff,**

v.

**William A. HALTER, Commissioner of Social Security, Defendant.**

**No. CIV 00–788 ADM/RLE.**

United States District Court, D. Minnesota.

March 29, 2001.

Aaron Thomas Stone, Strandemo & Sheridan, Eagan, MN, for Plaintiff.

Roylene Ann Champeaux, U.S. Atty., Minneapolis, MN, for Defendant.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

### I. INTRODUCTION

This matter is before the undersigned United States District Judge pursuant to Plaintiff Barbara J. Flaherty's Objections [Doc. No. 17] to the Report and Recommendation ("R & R") of United States Magistrate Judge Raymond L. Erickson [Doc. No. 16]. The R & R, dated February 16, 2001, recommends that Plaintiff's Motion for Summary Judgment [Doc. No. 6] be denied and that Defendant William A. Halter's[1] Motion for Summary Judgment [Doc. No. 13] be granted. Plaintiff objects to the R & R's conclusion that the Administrative Law Judge's ("ALJ") findings are supported by the record and the applicable law. For the reasons set forth below, the R & R is adopted in its entirety.

### II. BACKGROUND

The factual background for this matter is set forth extensively in the R & R and is incorporated by reference for purposes of the present objections.

### III. DISCUSSION

Plaintiff Barbara J. Flaherty ("Flaherty") objects to the R & R on two specific grounds. First, she objects to Judge Erickson's finding that substantial evidence existed for the ALJ to accord greater weight to the opinions of Dr. Adkins, Dr. Karayusuf, and Ms. Konke than to the opinion of Todd Mulliken, Flaherty's treating therapist. Objections at 2. Second, Flaherty objects to Judge Erickson's conclusion that substantial evidence existed

for the ALJ to discredit the credibility of Flaherty's testimony concerning her disability. *Id.* at 3–4.

### A. Standard of Review for R & R

A district court must make an independent, de novo evaluation of those portions of an R & R to which objection is made and may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(C); Minn. LR 72.1(c)(2).

### B. Standard of Review for Commissioner's Findings

■ The Commissioner's decision to deny social security benefits must be affirmed if it conforms to the law and is supported by substantial evidence on the record as a whole. *See* 42 U.S.C. § 405(g); *see also Qualls v. Apfel,* 158 F.3d 425, 427 (8th Cir.1998). On review, a court must take into consideration the weight of the evidence and determine whether or not substantial evidence in the record as a whole supports the findings upon which a plaintiff's claims were granted or denied. *See Loving v. Sec'y of Health and Human Servs.,* 16 F.3d 967, 969 (8th Cir.1994). "Substantial evidence" is a standard deferential to the agency and the ALJ. *See Ostronski v. Chater,* 94 F.3d 413, 416 (8th Cir.1996). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." *Johnson v. Apfel,* 240 F.3d 1145, 1147 (8th Cir.2001). The ALJ's decision must be upheld if there is substantial evidence supporting it, even if there is substantial evidence of the opposite decision as well. *See Terrell v. Apfel,* 147 F.3d 659, 661 (8th Cir.1998). Thus,

---

1. At the time this suit was initiated, Kenneth S. Apfel was the Social Security Commissioner.

neither the evidence nor the factual record is reviewed de novo. *Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir.1997).

## C. Treating Source

Flaherty argues that Judge Erickson erred in concluding that there was substantial evidence to accord greater weight to the opinion of sources other than her therapist Todd Mulliken ("Mulliken"). In general, opinions from treating sources are to be afforded greater weight than non-treating sources. 20 C.F.R. § 404.1527(d). If the treating source's opinion on the "nature and severity" of the impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case, it will be given "controlling weight." *Id.* § 404.1527(d)(2).

The opinion of a treating physician must be afforded substantial weight, but only where the opinion comes from an "acceptable medical source." 20 C.F.R. § 404.1527; *see also, Burress v. Apfel*, 141 F.3d 875, 880 (8th Cir.1998). Acceptable medical sources are listed in 20 C.F.R. § 404.1513(a) and include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.

The R & R concluded that Mulliken was a therapist or counselor who is not a recognized "acceptable medical source" as established by 20 C.F.R. § 404.1513(a). R & R at 37. Flaherty did not point to any evidence indicating otherwise in her R & R objections. As a counselor and not a licensed or certified physician or psychologist, Mulliken is not an "acceptable medical source" whose testimony must be afforded substantial weight by the ALJ. *See Barnett v. Apfel*, 231 F.3d 687, 689 (10th Cir.2000); *Hartranft v. Apfel*, 181 F.3d 358, 361–62 (3d Cir.1999); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d

525, 530 (6th Cir.1997); *Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir.1995); *Bird v. Apfel*, 43 F.Supp.2d 1286, 1291 (D.Utah 1999) (social workers cannot be "treating source" worth deference because they are not included in the list of "acceptable medical sources"); *cf. Cronkhite v. Sullivan*, 935 F.2d 133, 134 (8th Cir.1991) (ALJ properly gave little weight to treating chiropractor because chiropractor was not "acceptable source"). Because Mulliken was not a "treating source", the ALJ did not err by according his opinions less weight than other sources.

Even if Mulliken qualifies as a "treating source" under 20 C.F.R. § 404.1527, the ALJ's conclusions that other opinions should be afforded greater weight are substantiated by the record. Treating sources opinions are not "conclusive in determining disability status, and the opinion must be supported by medically acceptable clinical or diagnostic data." *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir.1997) (quoting *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir.1996)); *accord* 20 C.F.R. § 404.1527(d)(2). Federal regulations allow an ALJ to decline giving a treating source controlling weight where its conclusions conflict with other "substantial evidence" in the record, 20 C.F.R. § 404.1527(d)(2), or where other opinions are "supported by better or more thorough medical evidence." *Rogers*, 118 F.3d at 602.

The ALJ did not commit reversible error in coming to conclusions contrary to Mulliken's assertions. Several of Mulliken's opinions are inconsistent with assessments by Dr. Adkins and Dr. Karayusuf. *Compare* Tr. at 68, 70, 73, 181, 226 *with* Tr. at 379; *see* R & R at 38–40. Furthermore, the Mulliken opinions relied upon by Flaherty are internally inconsistent with Mulliken's clinical observations. *See, e.g.* Tr. at 304. Based on these findings of conflicting testimony, the ALJ had "sub-

stantial evidence" to reject Mulliken's opinions as controlling, even if Mulliken is deemed to be a "treating source." The ALJ's conclusions regarding the medical evidence are substantiated by the law and supported by the entire record.

### D. Flaherty's Credibility

 Flaherty also objects to Judge Erickson's finding that the ALJ's conclusions concerning her lack of credibility were supported by substantial evidence. Initially, credibility determinations are the province of the ALJ. *Stephens v. Shalala,* 46 F.3d 37, 39 (8th Cir.1995). However, the ALJ may discredit subjective complaints of disability only if the assertions are inconsistent with the record as a whole. *See Taylor v. Chater,* 118 F.3d 1274, 1277 (8th Cir.1997). In *Polaski v. Heckler,* 739 F.2d 1320, 1321–22 (8th Cir. 1984), the Eighth Circuit set out five factors that the ALJ must consider when reviewing whether a claimant's testimony is credible: "(1) the claimant's daily activities, (2) the duration, frequency and intensity of the pain, (3) dosage, effectiveness, and side effects of medication, (4) precipitating and aggravating factors, and (5) functional restrictions." *Shelton v. Chater,* 87 F.3d 992, 995 (8th Cir.1996). The ALJ must expressly delineate the relied upon inconsistencies when discounting a claimant's subjective complaints. *Id.* If this determination is supported by substantial evidence, it is not to be reversed. *Id.* at 996.

The ALJ's conclusions regarding the credibility of Flaherty's assertions about her ability to work are sustained by substantial evidence. First, the ALJ determined that Flaherty's daily activities were inconsistent with her alleged limitations. Tr. at 20–21. Flaherty exercised, bathed, shopped, and did laundry on a regular basis. Tr. at 19–20. She also took a number of major trips during this claimed disability, a fact regarded as unusual for someone suffering from severe depression. *Id.* at 72. Moreover, Flaherty has engaged in two romantic relationships, felt to be also uncommon for someone with her claimed disability. *Id.* at 73.

 Second, the ALJ noted that Flaherty has refused to take antidepressant medication to assist her recovery. *Id.* at 21; *See, e.g., Id.* at 231. A claimant's refusal to take medication that may mitigate his or her disability is inconsistent with a claim of a disability. *See Baumgarten v. Chater,* 75 F.3d 366, 368 (8th Cir. 1996). She alleges that her refusal is reasonable considering her fears that such medication is a sign of weakness and that a relative suffered side effects from drugs. Tr. at 432, 435. However, Flaherty herself has admitted that medication has allayed her condition in the past. *Id.* at 262. Her refusal to accept medication in spite of her assertion that she is totally disabled further undermines her credibility. Finally, the ALJ's determination that Flaherty's statement that certain jobs would be "too demeaning" for her reflects on the credibility of her determination that she is completely disabled from doing any work. *Id.* at 57. From these facts it is clear that the ALJ's determination that Flaherty's testimony was "not entirely credible" is supported by substantial evidence.

### IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. The February 16, 2001 Report and Recommendation of Magistrate Judge Raymond L. Erickson is **ADOPTED IN ITS ENTIRETY;**

2. The Plaintiff's Motion for Summary Judgment [Doc. No. 6] is **DENIED;** and,

3. The Defendant's Motion for Summary Judgment [Doc. No. 13] is **GRANTED.**

**LET JUDGMENT BE ENTERED AC-CORDINGLY.**

REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

I. *Introduction*

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social Security Act, *Title 42 U.S.C. § 405(g)*, seeking a judicial review of the Commissioner's final decision, which denied her application for Disability Insurance Benefits ("DIB"). The matter is presently before the Court upon the parties' cross-Motions for Summary Judgment. For these purposes, the Plaintiff has appeared by Aaron T. Stone, Esq., and the Defendant has appeared by Roylene A. Champeaux, Assistant United States Attorney. For reasons which follow, we recommend that the Plaintiff's Motion for Summary Judgment be denied, and that the Defendant's Motion be granted.

II. *Procedural History*

The Plaintiff filed an application for DIB on February 4, 1998, in which she alleged that she had become disabled on March 25, 1996. [T. 102–104]. Her claim was denied upon initial review, and upon reconsideration. [T. 86–88, 92–94].

On August 17, 1998, the Plaintiff requested a Hearing before an Administrative Law Judge ("ALJ") and, on November 10, 1998, a Hearing was conducted, at which time the Plaintiff appeared personally, and by an legal counsel. [T. 24, 26]. Thereafter, on December 18, 1998, the ALJ issued a decision which denied the Plaintiff's claim for benefits. [T. 15–23]. The Plaintiff then requested administrative review before the Appeals Council. [T. 10]. The Appeals Council—after reviewing new material that had been submitted by the Plaintiff—declined, on March 6, 2000, to alter the ALJ's decision. [T. 7–8]. Thus, the ALJ's determination became the final decision of the Commissioner. See, *Steahr v. Apfel*, 151 F.3d 1124, 1125 (8th Cir.1998); *Johnson v. Chater*, 108 F.3d 942, 943–44 (8th Cir.1997); *20 C.F.R. § 1481*. Thereafter, the Plaintiff commenced this action.

III. *Administrative Record*

A. *Factual Background.* At the time of the Hearing, the Plaintiff was 41–years–old. [T. 102] She has a twelfth grade education with additional business school training in the field of merchandising. [T. 129]. The Plaintiff has previously worked as a claims examiner, a customer service representative, and a customer service supervisor. [T. 132].

The Plaintiff contends that she is unable to work due to depression and anxiety, which began on March 25, 1996, when she discovered that her husband was having an affair. [T. 159]. Specifically, the Plaintiff states that she has problems sleeping, cannot follow through on tasks, cannot concentrate, has a very poor attention span, is apathetic, withdraws under stress, and is anxious about being around people. [T. 124].[1]

On December 11, 1996, the Plaintiff was admitted to United Hospital, and then was transferred to the Abbott Northwestern Hospital Emergency Room, due to an overdose of Fiorinal[2] with codeine. At the

---

**1.** The Plaintiff also claimed a disability because she had breast cancer and migraine headaches. These claims were denied by the ALJ, but the Plaintiff has not appealed those determinations. Accordingly, we limit our discussion to the Plaintiff's claim of disability due to depression and anxiety.

**2.** Fiornal is prescribed for the relief of the symptom complex of tension (or muscle con-

time, she stated that she may have been trying to kill herself because her marriage was in trouble. A few weeks prior to her admittance to the hospital, she had asked her husband to move out of the home and, on the night of the overdose, the couple were arguing. [T. 159]. At that time of her admission, the impression of the attending physician, Dr. Rauenhorst, was that the Plaintiff suffered from an adjustment disorder with disturbance of emotions and conduct, as well as intoxication by Fiorinal with codeine. *Id.* He recorded that the Plaintiff had a mild impairment of attention and concentration, and a mild to moderate impairment of reasoning. [T. 163]. The Plaintiff was detoxified, and was later discharged to her home, on December 12, 1996. [T. 159, 163].

Thereafter, the Plaintiff began participating in a "partial hospitalization" program, and attending group therapy at Abbott Northwestern. [T. 407–435]. She was treated by Dr. Boutin, who prescribed Wellbutrin[3] and Nortriptyline[4] for the Plaintiff, due to her depression. [T. 407]. It was noted that the Plaintiff was resistant to medication, and refused to increase her Nortriptyline dosage as encouraged, stating: "I'm too afraid, I don't like taking pills." [T. 430, 435]. The Plaintiff explained that she feared medications because her aunt deteriorated markedly from a mental illness after taking medication. [T. 428]. The Plaintiff later discontinued the medication. Upon discharge from the partial program on January 31, 1997, the Plaintiff informed Dr. Boutin that she planned to return to work. [T. 429]

Prior to, and after her suicide attempt, the Plaintiff was seeing a counselor, Todd Mulliken ("Mulliken"). She began the counseling in March of 1996. [T. 376]. He diagnosed her with major depression and, employing a strategy of "cognitive restructuring," he met with the Plaintiff in counseling sessions aimed at reducing her depression. [T. 229–376]. Mulliken's notes contain numerous references to the Plaintiff's depression, feelings of hopelessness, and suicidal ideation. [T. 229–376, 383–393, 395–405]. Likewise, there are many references to dates on which the Plaintiff was generally feeling not as depressed, and was not suicidal. *Id.* Mulliken also stated, several times, that the Plaintiff refused antidepressant medication even though he believed it might help her state of mind. [T. 231, 232, 255, 256, 262, 265, 267, 284, 291, 296, 301, 310, 316, 317, 321, 324, 329, 389].

In August of 1997, Mulliken reported that the Plaintiff was able to return to work, and was suitable for full-time employment as of October 1, 1997. [T. 304]. In May and June of 1998, however, he noted that the Plaintiff's concentration and short-term memory were impaired, and he opined that the Plaintiff was unable to work. [T. 233–34].

The Record contains a written account of a telephone conversation which took place on June 25, 1998, between Mulliken, and Jan Konke ("Konke"), who is a Disability Determination Service Consultative Examiner. Konke reported as follows:

---

traction) headaches. *Physician's Desk Reference*, at 2031 (53rd. Ed.1999).

3. Wellbutrin, a trademark for bupropion hydrochloride, is a monocyclic compound which is structurally similar to amphetamine, and which is used as an antidepressant. *Dorland's Illustrated Medical Dictionary*, pp. 237, 1843 (28th Ed.1994).

4. Nortriptyline refers to a tricyclic antidepressant that is used to treat symptoms of depression, and to relieve chronic, severe pain. *Dorland's Illustrated Medical Dictionary*, p. 1151 (28th Ed.1994).

I spoke to Todd Mulliken regarding his contacts with Barbara Flaherty. He reports that she continues to struggle with suicidal thinking. She refuses to take medication feeling that she does better without it. She continues to workout daily with her personal trainer. She sees this as therapy. She has not had panic attacks and is not psychotic. She does complain of difficulty sleeping and frequent awakening. She has some borderline tendencies. She was last hospitalized and last deteriorated 12/96. She tried to work briefly but felt that she couldn't concentrate well enough to manage her administrative position at Allina. He didn't know if she would be able to handle a less complicated or less stressful position. Although she is in a new relationship she is still struggling with coming to terms with her failure in the marriage. She experiences hopelessness about this. He believes she would be unlikely to attempt a job at this point because of the pending divorce. He does not believe there has been any change in her activities. He reports that she has been coming in for therapy appointments less frequently. [T. 377].

On March 19, 1998, the Plaintiff underwent a psychiatric examination by Dr. Alford S. Karayusuf. At the time of that examination, the Plaintiff complained of anxiety and depression, lack of concentration and focus, and trouble sleeping. The Plaintiff stated that she suffered from anxiety attacks when she thought about going out into the job market. The Plaintiff also recounted her work experience with Medica, Inc. ("Medica"), stating that she went back to work, from February to March of 1997, but quit when she was diagnosed with breast cancer. The Plaintiff advised that she had been told that her job would be waiting for her after she overcame her medical problems, but that, by July of 1997, the company no longer had her job

open. In addition, she was also dealing with the stress of her divorce. [T. 179]. Although the Plaintiff stated that she suffered from panic attacks, she was not taking any psychotropic medication, as she did not like the idea of taking an antidepressant drug. [T. 180].

The Plaintiff then recounted her typical daily activities. According to the Plaintiff, she dealt with her emotional problems by a vigorous exercise program. She had a personal trainer, with whom she met five times a week. She also lifted weights two to three hours a day. She bathed every day, but did not make her bed or cook. She usually ate take-out food. She did go grocery shopping approximately once a week, and she drove when she needed to get around. She had a housekeeper who came over and performed her housework, as well as an individual who took care of the outside work. She attended church once a week, although she found it difficult to concentrate at the services. She did not date, had no hobbies, and was not in contact with her family. [T. 180].

Dr. Karayusuf observed that the Plaintiff was oriented to time, place, and person, that her recent and remote memory were intact, that she was of average intelligence, and that her insight was fair. [T. 180]. He provisionally diagnosed the Plaintiff with depression and some anxiety, and concluded that she was able to understand, retrain, and follow simple instructions. He advised that she was restricted to work that involved brief, superficial interactions with fellow workers, supervisors, and the public; and that, within those parameters, and in the context of performing simple, routine, repetitive, concrete, tangible tasks, she was able to maintain pace and persistence. [T. 181].

The Plaintiff's file was also reviewed by Konke. [T. 215–228]. In reviewing the file, Konke found that the Plaintiff suf-

fered from an Affective Disorder, under Listing 12.04. [T. 215]. In regard to the Affective Disorder, Konke determined that the Plaintiff's disorder was evidenced by appetite disturbance with change in weight, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and anxiety. [T. 218]. In her "Mental Residual Functional Capacity" report, which is dated April 10, 1998, Konke advised as follows:

The claimant retains the capacity to concentrate on, understand, and remember routine, three and four step, and limited detailed instructions. The claimant would have moderate problems with multiple detailed, and marked problems with complex, instructions.

The claimant's ability to carry out tasks with adequate persistence and pace would be moderately impaired, but adequate for routine, repetitive tasks, but not for detailed or complex tasks.

The claimant's ability to interact and get along with co-workers would be moderately impaired, but adequate for brief and superficial contact.

The claimant's ability to interact with the public would be moderately impaired, but adequate for brief and superficial contact.

The claimant's ability to follow an ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision found in most customary work settings.

The claimant's ability to accept supervision would be moderately impaired, but adequate to cope with ordinary levels of supervision found in a customary work setting.

The claimant's ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive and a three and four step work setting.

This is a forty year old female who complaints [sic] of depression and anxiety associated with losing her job while being treated for breast cancer, divorce and loss of her pets, etc. File data indicate she retains the ability to tolerate basic tasks. She works with a personal trainer five times per week, attends church, drives, does laundry, etc. File data appear consistent and credible. She was to see her physician in January and refused anti-depressant medication feeling that she could manage adequately with psychotherapy.

[T. 226].

On October 13, 1998, Mulliken also completed a mental residual functional capacity assessment of the Plaintiff, in which he observes, as follows:

Barb has been struggling with major depression with chronic suicidality since March of 1996. She has gone through in-patient, partial, and out [patient] [treatment]. She has been on anti-depressants as well.

Barb's capacity to function in a work related environment is virtually non-existent. Her fragility & suicidality is too extreme. I fear a work environment may put her over the edge.

[T. 378–80].

The Plaintiff has an extensive work history with Medica. She was employed almost continuously by that company, from 1980 to March of 1996, which coincides with the onset of her disability. During that time, she was employed as a claims examiner, a customer service representative, a customer service lead, a customer service specialist, and a customer service manager. [T. 132–137]. A number of these positions required supervisory responsibilities. *Id.* Since the onset of her disability, in March of 1996, the Plaintiff has worked about two months, from February to April of 1997, for Allina Health Systems, formerly known

as Medica. She worked five-days-per-week, four-hours-a-day, and her reason for quitting the position was that she was diagnosed with cancer. [T. 140].

B. *The Hearing Testimony.* As a result of the Plaintiff's application for DIB, a Hearing was held before an ALJ, on November 10, 1998. The Plaintiff, first answering questions posed to her by the ALJ, related that at one point, around 1996, she had lost about 60 pounds. [T. 32–33]. She recounted that she began losing weight in February or March of 1996, claiming that she just stopped eating. Although she was taking prescribed antidepressants at the time, she did not believe that the medications contributed to her weight loss. [T. 34]. She contends that her weight loss had a lot to do with her relationship with her husband, and that she began to get her weight back once they were separated, in May of 1997. [T. 35].

The Plaintiff started taking medication in April of 1996. She claims that the medication did not help with how she was feeling. [T. 38]. In regard to her work, she told the ALJ that she was working up until about two to three weeks after she learned about her husband's affair. The Plaintiff did attempt to work again, from February to April of 1997, but she quit because she could not handle the situation. She explained that she had people reporting to her, and had projects to do, but that she was sitting at her desk crying much of the time. According to the Plaintiff, she would sit in meetings, and would start having anxiety attacks. [T. 39–40]. She also stated that she was not sleeping, she could not concentrate, and she did not care about anything. She would sometimes try to call her husband at work, but when she was told that he was not there, or that they had not seen him, she would just stop everything, and not be able to focus. [T.

40]. The Plaintiff believes that she failed in her marriage. [T. 46].

The ALJ noted that the Plaintiff was authorized to return to work by October 1, 1997. However, as the Plaintiff explained, she did not return as she had a lot of things going on at that time—it was after her breast surgery; it was about a month after her husband had moved out of the house again, and had served her divorce papers; and she had been told her job was no longer open at Allina. [T. 47–48].

The Plaintiff contends that she returned to work in 1997 because she feared that she would loss her job. At that time, she worked four hours a day. [T. 41]. When asked if there was any improvement in her condition after she stopped working, and went on medication, she stated that there was not. However, she did state that she stopped taking medication around March of 1997, because she did not feel that it was helping her. She also explained that the medication, which she was prescribed in April of 1996, did not help her. [T. 41–42].

During the same time, the Plaintiff continued to receive counseling. She would talk with her counselor about two to three times per week, sometimes by phone, and sometimes in person. [T. 42–43]. At the time of the Hearing, she was still receiving counseling by phone, but for the month prior to the Hearing, she mainly went into the office for counseling. Her reason for receiving counseling by phone was that she did not want to leave her house. [T. 43].

When asked about whether she has established any new relationships since she separated from her husband, the Plaintiff stated that she had been seeing people, but that she was not in any long term, committed relationships. She did admit to having a gentleman friend from Canada. At the time of the Hearing, she had seen quite a bit of this gentleman, having spent

some time with him in Canada during the Summer, and much of the Fall. In regard to these trips, the Plaintiff stated that she was "running away to Canada, and it's nice to have someone in a way take care of you." [T. 44].

She also had a intimate relationship with another gentleman, which lasted from about July to December of 1997. Although they no longer had that type of relationship, they remained friends. [T. 45]. The Plaintiff claimed, however, that during the relationship, her depression did not get any better.

The Plaintiff also spoke about her admittance to the hospital for an overdose, in December of 1996. She stated that she was there about a couple of nights. There have been no similar occurrences since that time, however. [T. 48].

The Plaintiff employs a housekeeper, which she has done since before her problems began in March of 1996. [T. 48]. She did do her own grocery shopping, although she claimed that her refrigerator and cupboards were pretty bare. She did her own laundry. [T. 49]. She had a membership with a health club, where she performed weight training although, since July of 1998, she had only been there a couple of times. Prior to that, she went about five times a week. [T. 49].

When asked about her sleep patterns during the previous month, the Plaintiff related that she usually went to sleep between two and six o'clock in the morning, and that she usually slept between three and five hours a night. She did not take naps in the afternoon. She did very little reading, and watched about two to three hours of television per day. Otherwise, she did not engage in many other activities. [T. 52].

The Plaintiff was then questioned by her attorney. When asked how frequently she left her home, she estimated a couple of times a week. When she would leave, she usually tried to take care of a lot of her errands, so that she would not have to leave the next day. She felt more comfortable when she was at home. [T. 52–53]. The Plaintiff also related that she did not have any family members that she kept in touch with, or visited on a regular basis. Her family lived within about five miles of her home, although she claimed that she had seen her brother and sister about two times in the last year and one-half. Prior to March of 1996, she claimed that she had a good relationship with her family, that she would talk with her siblings on a daily basis, and would see them, and her parents, about once a week. [T. 53]. She also recounted that she has shut a lot of friends out of her life, and that she probably had only one girlfriend that she kept in touch with, primarily by phone. [T. 53–54].

When asked whether she felt she had improved since March of 1996, the Plaintiff stated that she felt as if she was regressing because, in the beginning, she would "throw [herself] out and * * * do things" whereas, at the time of the Hearing, she did not. [T. 54]. She stated that she attempted to do other activities, such as taking a French class, but that she had to quit because she could not concentrate, and could not retain the information. [T. 55]. She also recounted that she was frequently late for appointments, or she cancelled them altogether, which was never a problem before March of 1996. *Id.* The Plaintiff further explained that she had difficulty following through with things, and related that much of the time she relied on her friends or neighbors for help. [T. 56].

When asked what she felt was the biggest impediment to her working, she replied that she could not attribute it to one thing but, rather, she related it to such things as lack of concentration, failure to

retain information, and apathy. *Id.* She did not believe she would be able to do a job that did not require a lot of concentration, or one that was not very mentally challenging, because her prior jobs were more skilled labor, and she would feel horrible doing a less skilled job. She stated that such a position would be demeaning, and would be very bad for her self-esteem. [T. 57].

Finally, the Plaintiff's attorney asked her if she had anything else to tell the ALJ, to which she replied that she had given up, that she did not want to live any more, and that if she had her choice, she would never have had her breast cancer surgery. *Id.* The ALJ then asked the Plaintiff a few more questions, including the income she was living on at the time, as well as some additional information regarding her life. The Plaintiff replied that her husband was recently ordered to pay alimony, and that, for a while, she had disability from her company, although that had been exhausted in about May or June of 1998. She further related that she did have a driver's license, and could drive a car. [T. 58].

Next, Dr. Jones Adkins, the Independent Medical Advisor, testified. He first asked the Plaintiff about the frequency with which she consumed alcohol. He explained that, according to the Record, she had drank occasionally, sometimes leading to intoxication or black outs, but that she quit in January of 1997. The Plaintiff affirmed that information, adding that, after her husband left, she had gone out on once occasion, and drank too much, and woke up in her home after someone had sexually molested her. [T. 60]. She then stated that, after she quit drinking in January of 1997, she resumed again around June of 1997. *Id.* During the months prior to the Hearing, the Plaintiff stated that she probably averaged around six beers or drinks during a month. [T. 61].

Dr. Adkins then asked the Plaintiff about several trips she had taken to Canada during the late Summer and early Fall of 1998, as well as a trip she took to New York in February of 1998. In regard to the trips to Canada, the Plaintiff explained that she would go out to eat with her friend Serge, but that, during the day, when he was at work, she would sit at home and watch television. [T. 62]. As to her trip to New York, she stated that she went to visit a friend. She explained that, as much as she liked being at home, it was sometimes difficult for her to be there, so she would run away. *Id.*

Next, Dr. Adkins asked the Plaintiff about the medications that were prescribed for her depression, as well as her therapy with Dr. Boutin. The Plaintiff recounted that she was prescribed Wellbutrin, which she took at full strength, in January of 1997, although she stopped in March of 1997. [T. 41, 62]. The Plaintiff then turned to her sessions with Mulliken. Dr. Adkins related that it did not appear that Mulliken was a licensed psychologist or social worker, but that he did have a master's degree. In regard to the therapy with Mulliken, the Plaintiff explained that her therapy was conducted by a combination of phone sessions and face-to-face sessions. [T. 63]. Finally, Dr. Adkins asked the Plaintiff about her work with a personal trainer. She explained that she did attend a club regularly, but that during the month prior to the Hearing, she probably only went once. Her reason for the reduction was that she was no longer interested. [T. 64].

Based on the medical records, as well as the Plaintiff's testimony, Dr. Adkins concluded that the Plaintiff suffered impairments, under the Psychiatric Review Techniques and Categories, of 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders). [T. 66]. In regard to the Plain-

tiff's rating, under Part B of the criteria for 12.04 and 12.06, Dr. Adkins testified:

And I'm juxtaposing this against—not against alongside testimony today that when you look at the records of Mr. Millikan [sic], there are episodes of deterioration with depressed mood, but also sometimes when claimant has felt better, I have a reference also in my testimony and questions taking a number of trips, New York, going to Mexico where she met Serge, I believe, that was March 12th, 1998, that when people are severely depressed, they tend not to go on trips. I can certainly understand the motivation to want to escape from unpleasantness and the pain that claimant has experienced here, which has been considerable marital distress, but it does not seem to be a continuous unabated severe depression with the exception of the last few months where there has been a decrease in activity from daily trainer to a significant sleep problems [sic], sleep between two and six a.m. and only sleeping three to five hours is insufficient sleep.

[T. 66].

Dr. Adkins and the ALJ then discussed the possibility of medication for the Plaintiff's problem with sleeping, to which the Plaintiff noted that her doctors did know about her sleeping problem, and that they had prescribed sleeping pills, but she often did not fill the prescriptions. *Id.*

Dr. Adkins also pointed out a "waxing and weaning [sic]" in the Plaintiff's conditions, noting that Mulliken cleared her for work in August of 1997, although, during that month, she had reported on one day that she had felt very sad and had suicidal thoughts, and on another day that she was feeling better, with no suicidal ideation. [T. 68]. In regard to time periods in which there had been improvement in the Plaintiff's condition, Dr. Adkins stated that there was probably improvement through

August, prior to the Hearing, as evidenced by the Plaintiff's trips. *Id.* Dr. Adkins did note that, although alcohol was not a material factor in her depression, it certainly was not helping, as alcohol is a significant exacerbation of depression. *Id.*

In regard to the functional limitations imposed by the Plaintiff's impairments, Dr. Adkins opined:

The activities of daily living although restricted are probably moderate difficulties in maintaining social function, having some relationships with Serge and then a report of a recent relationship, but withdrawing from family, that's very significant. So I'm going to go with moderate to marked on that. It varies. It waxes and wanes. Her deficiencies in concentration, persistence, or pace, Dr. Carey Usoff [sic] described the claimant to remember three to three [sic] objects over probably a 10 to 15 minute super span. Was able to do [serial] sevens accurately, remember four of the last five presidents and digits four out of seven, and digits backwards was three. Digits backwards should be just a little bit better than that, but that still falls within broad normal limits. So I'm going to say often from the standpoint often but significant because having difficulties in French and that is mainly verbal storage, which is easier than abstract storage still suggest that there is some fairly significant problems.

\* \* \* \* \* \*

So in summary of functional limitation, one to two would be considered difficulties in maintaining social functioning from moderate to marked. And then going to number two under C criteria of listings for anxiety related disorders, there is some evidence to suggest withdrawal, but not to point where symptoms result in a complete inability to

function independently outside the area of one's home. [T. 69–70].

When questioned by the Plaintiff's representative, Dr. Adkins explained that, from February of 1998 to October of 1998, the Plaintiff had the ability to go on trips, but also had interspersed instances of decline. Therefore, he concluded that the Plaintiff was able to maintain her behavior for a month or two at a time, but had difficulty sustaining it. [T. 71]. Dr. Adkins also noted that he saw such "waxing and waning" more with dysthymia, which is a low grade chronic depression, with episodes of significant depression, but such "waxing and waning" was not necessarily typical with major depression, as he noted that 80 percent of the people respond positively to antidepressant therapy. However, such "waxing and waning" is more typical with borderline personalities, which he did not state that the Plaintiff was experiencing. *Id.*

In regard to the Plaintiff's ability to take trips, Dr. Adkins explained why he placed significance on that fact as follows:

First of all, it has to be planned. You don't just grab your toothbrush and get on a plane or on a bus or whatever. You have to do some planning. Secondly, you have to have motivation enough to get up in the morning and put your clothes on and get ready to get on the plane and go there. And thirdly, when you're going to visit, such as a friend in New York, going to see Serge and his family. He has some children. Unless there are (inaudible) when you get there, you retire to your room, there are some social interaction [sic]. People who are severely depressed, who have a major depression who can't get out of bed don't go on trips. That's very rare. We sometimes see this in people who have an amnestic, a geographic amnesia, they just leave, a feud or something like that, but generally not with major depression. With dysthymia people can pull themselves together and go on trips, but the trips were for a fairly lengthy period of time, two and a half weeks, three weeks, that sort of thing. [T. 72].

When asked whether it was significant that the Plaintiff's behavior on the trips changed little from her behavior at home, Dr. Adkins explained that taking a trip does not necessarily diminish or eliminate a depressive diagnosis, but he also noted that the Plaintiff got romantically involved on her trip to Mexico, which is something that showed that the depression was not so severe. He explained that, after dealing with all of his patients during his career, people who are severely depressed tend not to go on trips, or to get romantically involved in a relationship. [T. 73].

After Dr. Adkins expressed this opinion, however, the Plaintiff explained that, in regard to her trip to Mexico, her friends planned the trip and booked the tickets for her. As to going to Canada, "really about the only planning is I picked up the phone and called Northwest Airlines and went to Canada." She also stated that she did not interact with Serge's children when she was in Canada. [T. 74]. In response, Dr. Adkins stated that such behavior does show a continuation of some of the depressive symptoms, but he reiterated that, in his experience, people who are severely depressed "tend not to be able to mobilize themselves even when people help them a lot." He further stated that he could "see maybe one trip, but it's consistent;" "[i]t's consistent over extended periods of time." *Id.* Dr. Adkins did admit that, during his career, he had seen a couple of patients with severe depression who would take trips like the Plaintiff, but he reiterated that it was rare, and that, if the patient was taking such trips, he usually saw it as

an indicator of improvement. *Id.* The Plaintiff also interjected that, regardless of what was in her medical records, there had not been a day that had gone by that she wanted to live, or a day on which she had not cried. She disputed any notations in Mulliken's records, such as, for example, on October 27, 1997, when it was noted that she was feeling better and had no suicidal ideation. [T. 75].

Finally, the Plaintiff's attorney asked whether the duration of the Plaintiff's counseling with Mr. Mulliken indicated anything to Dr. Adkins. Dr. Adkins stated that such continuous, frequent counseling indicated need, and that it is favorable that she had access to regular therapy. He further relayed that it was unusual in today's insurance based society to have access to such therapy, but he acknowledged that he did see people on a weekly basis, when authorized by insurance, and that he also had private pay patients, on a sliding fee, who he saw on a weekly basis. [T. 76].

Next, the ALJ obtained the testimony of the Vocational Expert ("VE"), Steven Brosh. The VE first asked the Plaintiff what her status was with Medica, to which she replied that she was terminated. Then the ALJ asked the VE the following hypothetical question:

ALJ: If I were to assume that we had a female person we were considering of the age range of 38 to 41 with the education and work experience as set out in your report and as set out by the record who does have impairments as the doctor has testified. There are diagnoses in the file including that of major depression and characterized as depression, and add she's had also a mastectomy, apparently without complications at this point in time. She's had the diagnoses of an anxiety disorder as well. Those are the primary impairments based on the record. She is taking some medication. I wanted to pose functional limitations for side effects of medications. Physically from an exertional standpoint, there really are no limitations there. The limitations relate to mental impairments for non-exertional. If I were to give you the restrictions that she would be limited to work only of a brief superficial type contact with coworkers and supervisors and members of the public as a part of the job task and also to work as more of a simple, routine, repetitive, concrete tangible type of a task and also that drugs or alcohol will not be served at the job site, are there jobs within the region—first of all, could a person perform any of the past work that you've set forth in your exhibits.

VE: I would say no.

ALJ: Are there any jobs in the region that a person with those restrictions could perform in your opinion?

VE: Yes, there would be jobs to fit your hypothetical, Judge. Taking into consideration past work, I think that work as an office helper would fit. DOT code 239.567.010. That work is light and unskilled in nature. There are about 7,000 office helpers in the State of Minnesota. Another possibility would be clerical sorting occupations. DOT code 209.687.022. That work is sedentary and unskilled in nature. There are about 1,500 of those jobs. Then we get into some production type work like assembly work. One representative DOT code would be 706.684.022. That work is light and unskilled. Conservatively speaking there would be 10,000 assembly type jobs in the state. And another possibility similar in nature of production oriented would be hand packaging activity, DOT code 920.587.018. It is unskilled work. There are about 18,000

people employed in hand packaging activities in the state. [T. 78–79].

If the hypothetical were changed to incorporate the limitations posited by Exhibit 11–F—that is, Mulliken's report—then, the VE explained, no work would be possible. [T. 79] Also, if the added limitation of chronic and habitual problems with tardiness were added, then the VE concluded that no work would be possible. [T. 80].

C. *The ALJ's Decision.* The ALJ issued his decision on December 18, 1998. As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by *20 C.F.R. § 404.1520.*[5] [T. 16]. As a threshold matter, the ALJ concluded that the Plaintiff had not engaged in a substantial gainful activity since March of 1996. *Id.*

Next, the ALJ examined whether the Plaintiff was subject to any severe physical or mental impairment, which would substantially compromise her ability to engage in work activity. See, *20 C.F.R. §§ 404.1521; 20 C.F.R. §§ 416.921.* The ALJ concluded that there was evidence that the Plaintiff was subject to one or more mental impairments. Specifically, the ALJ agreed with Dr. Adkins diagnosis that the Plaintiff was subject to the mental impairments of dysthymia, an anxiety dis-

order, and a substance addiction disorder. Thus, her mental impairments were most appropriately evaluated under Section 12.04, Affective Disorders; Section 12.06, Anxiety Related Disorders; and Section 12.09, Substance Addiction Disorders. [T. 17].

After evaluating the Plaintiff's disorders under the Listing of Impairments, the ALJ found that she had moderate restriction of activities of daily living. The determination was based on the testimony of Dr. Adkins, as well as the testimony of the Plaintiff. The ALJ highlighted the Plaintiff's testimony that she had two romantic involvements during the period in which she alleged to have been disabled, that she worked out frequently—for as much as three hours per day—that she did her own grocery shopping, and that she bathed daily and did her own laundry. *Id.*

The ALJ further found that the Plaintiff had moderate difficulties in maintaining social functions. This determination was based on the testimony of Dr. Adkins. The ALJ noted that, while the Plaintiff did separate from, and later divorce her husband during the applicable time period, she also had two romantic involvements, and that she was able to drive herself wherever she needed to go. [T. 18].

---

**5.** The five-step sequential process has been paraphrased as follows:

　　1. If the claimant is engaged in substantial gainful activity, disability benefits are denied.

　　2. If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether the impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

　　3. If the impairment is severe, it is compared with the listed impairments the [Commissioner] acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

　　4. If there is no conclusive determination of severe impairment, then the [Commissioner] determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

　　5. If the claimant cannot do her previous work, the [Commissioner] must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

*Trenary v. Bowen,* 898 F.2d 1361, 1363–64 n. 3 (8th Cir.1990), paraphrasing *Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

The ALJ also found that the Plaintiff often experienced deficiencies of concentration, persistence or pace. This determination was based upon the testimony of Dr. Adkins, as well as the psychiatric evaluation in March of 1998, which determined that the Plaintiff had the ability to understand, and retain and follow simple instructions. *Id.* The ALJ noted that the Plaintiff had the concentration and persistence to work out almost daily, and sometimes for as much as three hours at a time. *Id.*

Finally, the ALJ found that the Plaintiff had experienced one to two episodes of deterioration or decompensation in work or work-like settings. This determination was based upon the testimony of Dr. Adkins. *Id.*

Based on the foregoing, the ALJ determined that the Plaintiff's disorders did not meet or equal the requirements of any section of the Listing of Impairments. *Id.* Therefore, he proceeded to evaluate the Plaintiff's Residual Functional Capacity.[6] The ALJ found that the Plaintiff retained the ability to perform basic work activity with the following restrictions: she could tolerate only brief and superficial contact with co-workers, supervisors, and the general public, and she required work that would consist of simple, routine, tangible, repetitive, and concrete tasks. In coming to this conclusion, the ALJ relied upon the testimony of Dr. Adkins. *Id.*

The ALJ explained that he considered the medical record as a whole. However, with respect to the opinion expressed by the Plaintiff's therapist, Mulliken, that the Plaintiff could not work, the ALJ stated that the opinion was sharply contrasted by the medical evidence as a whole, as well as the testimony by Dr. Adkins. Moreover, the ALJ noted that Mulliken's opinion was contradicted by his own notations, in which he frequently reported that the Plaintiff was not suicidal. His notations further detailed how active the Plaintiff was, including her frequent exercising, and her long vacations to places such as Mexico, New York City, and Hawaii. [T. 19–20].

The ALJ next evaluated the Plaintiff's subjective complaints, under *Polaski v. Heckler,* 739 F.2d 1320–22 (8th Cir.1984). He found that the Plaintiff was a fairly active individual. He also noted that, during the time that she alleged that she was disabled, the Plaintiff had two romantic involvements, she worked out a considerable amount of time—as much as three hours per day—she shopped for groceries, bathed on a daily basis, and did her laundry. The ALJ found that this degree of activity was inconsistent with the Plaintiff's allegation of disability. [T. 20].

The ALJ further noted that the Plaintiff had made statements indicating that she would have returned to her former job, following her surgery, if it had remained open for her. However, the ALJ also found that the evidence suggested that the Plaintiff's financial position was one which permitted her to refrain from working if she chose to do so, and that she did not appear to be an individual motivated to return to work. [T. 20–21]. Moreover, the ALJ considered the Plaintiff's course of medical treatment, and her use of prescription medication. The Plaintiff had consistent therapy for her depression and, although she has tried antidepressants, the Record reflected that she had declined that form of medication more than once. As a result, the ALJ determined that the Plaintiff's testimony was not entirely credible. [T. 21].

---

**6.** Residual functional capacity ("RFC") is a measure of what a claimant can do despite her limitations. See, *20 C.F.R. § 404.1545.*

The ALJ then proceeded to the fifth step of the sequential process. He noted that the burden of proof shifted to the Social Security Administration to demonstrate that there were other jobs, existing in significant numbers in the relevant economy, for which the Plaintiff was qualified. *Id.;* see also, *Lewis v. Heckler,* 808 F.2d 1293, 1297 (8th Cir.1987). As related by the ALJ's decision:

> The vocational expert testified that an individual with a profile matching the claimant's with respect to her age, education, past work experience, severe impairments and corresponding residual functional capacity would be able to perform work which exists in significant numbers in the national economy. Mr. Brosh identified various jobs such an individual could perform and the number of each job existing in the relevant region. Specifically, he identified the jobs of office worker (7,000 jobs in the relevant region), clerical sorting (1,500 jobs), assembly (10,000 jobs) and hand packing (18,000) jobs. Based on this credible and persuasive testimony, the undersigned finds that the claimant is able to perform work existing in significant number in the national economy and is, therefore, not disabled.

[T.21–22].

As noted, the Plaintiff challenges the ALJ's findings and conclusions.

### III. *Discussion*

A. *Standard of Review.* The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole. See, *Title 42 U.S.C. § 405(g);* see, also, *Qualls v. Apfel,* 158 F.3d 425, 427 (8th Cir.1998); *Gallus v. Callahan,* 117 F.3d 1061, 1063 (8th Cir.1997). This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision. See, *Morse v.* *Shalala,* 32 F.3d 1228, 1229 (8th Cir.1994), citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488–91, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, *Cox v. Apfel,* 160 F.3d 1203, 1206 (8th Cir.1998); *Newton v. Chater,* 92 F.3d 688, 692 (8th Cir.1996), and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed. See, *Wilcutts v. Apfel,* 143 F.3d 1134, 1136 (8th Cir. 1998). On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether or not substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was granted or denied. See, *Loving v. Secretary of Health and Human Services,* 16 F.3d 967, 969 (8th Cir.1994); *Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See, *Jackson v. Apfel,* 162 F.3d 533, 536 (8th Cir.1998); *Black v. Apfel,* 143 F.3d 383, 385 (8th Cir.1998). Therefore, if it is possible to draw two inconsistent positions from the evidence and one of those positions coincides with the agency's findings, then we must affirm the decision. See, *Fenton v. Apfel,* 149 F.3d 907, 910 (8th Cir.1998); *Scott v. Chater,* 112 F.3d 367, 368 (8th Cir.1997). Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result. See, *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir.1995); *Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions and,

therefore, it embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal. See, *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir.1994). Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record *de novo*. See, *Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir.1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir.1996).

B. *Legal Analysis.* In support of her Motion for Summary Judgment, the Plaintiff advances the following arguments:

1. The ALJ failed to give appropriate weight to the opinion of the Plaintiff's therapist.

2. The ALJ erred in determining that the Plaintiff's testimony was not fully credible.

3. The vocational evidence did not support the ALJ's determination that the Plaintiff could perform a significant number of jobs in the national economy.

We consider each of these arguments, in turn.[7]

1. *The ALJ's Treatment of the Opinions of Mulliken.*

a. *Standard of Review.* When a case involves medical opinion—which is defined as "statements from physicians and psychologists or other acceptable medical sources"—the opinion of a treating physician must be afforded substantial weight. See, *20 C.F.R. 404.1527;* see also, *Burress v. Apfel*, 141 F.3d 875, 880 (8th Cir.1998); *Grebenick v. Chater*, 121 F.3d 1193, 1199 (8th Cir.1997); *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir.1996); *Miller v. Shalala*, 8 F.3d 611, 613 (8th Cir.1993); *Onstead v.*

*Sullivan*, 962 F.2d 803, 805 (8th Cir.1992); *Kirby v. Sullivan*, 923 F.2d 1323, 1328 (8th Cir.1991). Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive. An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole. See, *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir.1997); *Pena v. Chater*, supra at 908; *Ghant v. Bowen*, 930 F.2d 633, 639 (8th Cir.1991); *Kirby v. Sullivan*, supra at 1328; *Ward v. Heckler*, 786 F.2d 844, 846 (8th Cir.1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence. See, *Rogers v. Chater*, supra at 602; *Ward v. Heckler*, supra at 846. In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise. *Id.* As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement. See, *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996), citing *Thomas v. Sullivan*, supra at 669. Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion. *Id.; Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir.1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ

---

7. As a note, for purposes of the Social Security Regulations, "disability" is defined as follows:

[T]he inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

*20 C.F.R. § 404.1505(a).*

in determining what weight should be afforded to the opinion of a given physician, including a treating physician. The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole." See, *20 C.F.R. §§ 404.1527(d)(4) and 416.927(d)(4)*. More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." See, *20 C.F.R. §§ 404.1527(d)(5) and 416.927(d)(5)*. When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the claimant's impairments. See, *20 C.F.R. §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii)*. Finally, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner—such as whether a claimant is disabled, or is unable to work—are not to be given any weight by the ALJ. See, *20 C.F.R. §§ 404.1527(e)(1) and 416.927(e)(1)*.

b. *Legal Analysis.* The Plaintiff contends that the ALJ failed to properly evaluate the medical evidence, the bulk of which consisted of treatment notes and reports from Mulliken—the Plaintiff's therapist. The Plaintiff argues that Mulliken's opinions should be afford the status of a "treating source." See, *Plaintiff's Brief in Support of Motion for Summary Judgment,* at 4 ("Plaintiff's Brief"). Moreover, she claims that, even if Mulliken's opinion was not treated as an opinion from a "treating source," the ALJ still did not afford appropriate weight to those opinions, considering the duration of the Plaintiff's therapy with Mulliken. See, *Plaintiff Reply Brief in Support of Motion for Summary Judgement,* at 2 ("Plaintiff's Reply Brief").

Under the Code of Federal Regulations, an ALJ must treat an opinion from an "acceptable medical source," who is a treating source, according to the "treating physician" rules set out in *20 C.F.R. § 404.1527(d)(2)*. An "acceptable medical source" is defined as a licensed physician, a licensed osteopath, a licensed or certified psychologist, a licensed optometrist, and "persons authorized to send us a copy or summary of the medical records of a hospital, clinic, sanatorium, medical institution, or health care facility." *20 C.F.R. § 404.1513(a)(1–5)*. There is no evidence that Mulliken is a licensed or certified psychologist—rather, it appears that he is a therapist or a counselor.[8] Therefore, the ALJ did not have to accord Mulliken's opinions the weight afforded to those of an "acceptable medical source." See, *Cronkhite v. Sullivan,* 935 F.2d 133, 134 (8th Cir.1991) ("The ALJ properly gave little weight to the opinions of Cronkhite's chiropractors because such evidence is not considered an 'acceptable source' of medical information to prove disability."); *St. Clair v. Apfel,* 215 F.3d 1337, 2000 WL 663958 at *3 (10th Cir. May 22, 2000) [unpublished decision] (chiropractor not an "acceptable medical source"); *O'Quinn v. Apfel,* 1999 WL 375898 (D.Or., April 26, 1999) ("licensed clinical social worker * * * is not an acceptable medical source"); *Bird v. Apfel,* 43 F.Supp.2d 1286, 1291 (D.Utah 1999) (social worker not an acceptable medical source); *Alosa v. Secretary, HHS,* 1994 WL 259775 (D.N.H. Feb.24, 1994) (physician's assistant not an acceptable medical source); but, c.f., *Mont*

---

8. Mulliken would appear to fall under the category of "other sources" which include: "public and private social welfare agencies," "observations by non-medical sources," and "other practitioners." *20 C.F.R. § 404.1513(e)(1–3)*.

*v. Chater,* 114 F.3d 119, 1997 WL 201626 at *6 (7th Cir. April 17, 1997) [unpublished decision] (stating that an alcohol counselor with two bachelor of science degrees could be characterized as an opinion from a treating source, but that did not imply that his opinion must be given more weight than a consulting physician).

Nonetheless, the ALJ explicitly considered Mulliken's opinion, concerning the Plaintiff's limitations, although he concluded that they were not entitled to controlling weight because Mulliken's conclusions were inconsistent with other medical evidence in the Record, including the opinions of Dr. Adkins, and Dr. Karayusuf, and they were also inconsistent with many of his own notations. [T. 19–20].

Mulliken believed that the Plaintiff's functional capacity, in a number of areas including the ability to understand and remember short and simple instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, the ability to work in coordination, the ability to accept instruction, and the ability to get along with co-workers or peers, was markedly limited. [T. 379]. This assessment was contradicted by the opinion of Dr. Adkins. While Dr. Adkins did express the opinion that the Plaintiff exhibited some characteristics of depression, including weight loss, and separation from family and friends, he further concluded that, with the exception of the previous few months, the Plaintiff's condition did not seem to be a continuous, unabated, severe depression, as she experienced periods of improvement. [T. 68]. Dr. Adkins specifically found remarkable that a number of the Plaintiff's activities, including the trips she took to Mexico and Canada, did not coincide with his experience as to the types of activities in which severely depressed individuals engage. [T. 73]. Therefore,

Dr. Adkins determined that the Plaintiff's condition did not render her completely unable to function outside of her home. [T. 70].

Moreover, Mulliken's opinion was inconsistent with Dr. Karayusuf, who concluded that the Plaintiff was able to understand, retain, and follow simple instructions, but that she was restricted to work involving brief, superficial interactions with supervisors, co-workers, and the public. [T. 181]. Such an appraisal was also consistent with the evaluation by Konke, who found that the Plaintiff could maintain pace and persistence within the context of performing simple, routine, repetitive, concrete, tangible tasks; could interact with supervisors, co-workers, and the public on a brief and superficial basis; could function and cope with the ordinary level of supervision in a customary work setting; and could tolerate the routine stressors of a routine, repetitive three- and four-step work setting. [T. 226]. While we afford Konke's appraisal, which was conducted solely on a review of the Plaintiff's medical record, little weight, we regard its alignment with the substantial weight of the medical record to warrant our consideration.

Furthermore, as the ALJ noted, Mulliken's own notations were inconsistent with his opinion, that the Plaintiff could not work, or that she was struggling with major depression and chronic suicidal thinking. There were a couple of instances, in March of 1997 and July of 1997, as to which there are notations about the Plaintiff's attempts to return to work. Moreover, on August 5, 1997, Mulliken wrote to the Human Resources Department for Allina Health Systems, advising that the Plaintiff was able to return to work full-time, by October 1, 1997. [T. 304]. Similarly, Mulliken's records reflect that the Plaintiff experienced periods of time in which she was more depressed, and other

times where her condition was improved. There were also specific references to a number of days on which she had no suicidal ideation.[9] His notations further reflect that Plaintiff was a fairly active individual, who was taking many trips. Thus, although the Plaintiff's RFC, as found by the ALJ, was not wholly consistent with the limitations expressed by Mulliken, we find that the ALJ's decision is supported by substantial evidence in the Record, namely the findings of Dr. Adkins, Dr. Karayusuf, and Ms. Konke. Moreover, the ALJ appropriately gave Mulliken's opinions less weight, given their inconsistency with his clinical observations. We would not suggest that the Record on this issue weighed only in one direction, but where, as here, the ALJ must select from two plausible evidentiary showings, we are not empowered to reweigh his findings when, as here, they are supported by substantial evidence.

2. *The ALJ's Assessment of the Plaintiff's Credibility.*

a. *Standard of Review.* The governing law makes clear that credibility determinations are initially within the province of the ALJ. See, *Driggins v. Bowen,* 791 F.2d 121, 125 n. 2 (8th Cir.1986); *Underwood v. Bowen,* 807 F.2d 141, 143 (8th Cir.1986). As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole. See, *Miller v. Shalala,* supra at 613; *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993).

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the Plaintiff's testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony. See, *Shelton v. Chater,* 87 F.3d 992, 995 (8th Cir. 1996); *Hall v. Chater,* 62 F.3d 220, 223 (8th Cir.1995); *Cline v. Sullivan,* 939 F.2d 560, 565 (8th Cir.1991); *Ricketts v. Secretary of Health and Human Services,* 902 F.2d 661 (8th Cir.1990). These requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ. See, *Johnson v. Secretary of Health and Human Services,* 872 F.2d 810, 814 n. 3 (8th Cir.1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in this Circuit by *Polaski v. Heckler,* supra, and its progeny. See, e.g., *Shelton v. Chater,* supra; *Jones v. Chater,* 86 F.3d 823 (8th Cir. 1996); *Hall v. Chater,* supra at 223. Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

1. the claimant's daily activities;

2. the duration, frequency, and intensity of the pain;

3. precipitating and aggravating factors;

4. dosage, effectiveness and side effects of medication; and

5. functional restrictions.

*Polaski v. Heckler,* supra at 1321–22.

The ALJ must not only consider these factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole. Cf., *Jones v. Chater,* supra at 826; *Delrosa*

---

9. Although the Plaintiff claimed, at the Hearing, that she never told Mulliken that there were days that she was feeling better, or on which she did not have suicidal thoughts, he frequently made specific notations regarding the Plaintiff's lack of suicidal ideation. [T. 243, 250, 251, 258, 271, 273, 275, 278, 284, 285, 288, 289, 290, 291, 292, 294, 297, 300, 302, 305, 306, 314, 315, 349].

*v. Sullivan,* 922 F.2d 480 (8th Cir.1991); *Carlock v. Sullivan,* 902 F.2d 1341 (8th Cir.1990).

It is well-settled that an ALJ may not disregard a claimant's subjective complaints solely because there is no objective medical evidence to support them. See, *Ostronski v. Chater,* supra at 418; *Jones v. Chater,* supra at 826; *Metz v. Shalala,* supra at 376. It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual. See, *Simonson v. Schweiker,* 699 F.2d 426 (8th Cir.1983). For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general physical well-being is generally deteriorated." *O'Leary v. Schweiker,* 710 F.2d 1334, 1342 (8th Cir.1983); see also, *Landess v. Weinberger,* 490 F.2d 1187 (8th Cir.1974). Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole. *Taylor v. Chater,* 118 F.3d 1274, 1277 (8th Cir.1997); *Johnson v. Chater,* supra at 944.

Nevertheless, as the decisions of this Circuit make clear, the interplay of the *Polaski* factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of pain, are without limit. For example, an individual's failure to seek aggressive medical care militates against a finding that his pain is disabling. See, *Chamberlain v. Shalala,* 47 F.3d 1489, 1494 (8th Cir.1995); *Barrett v. Shalala,* 38 F.3d 1019, 1023 (8th Cir.1994); *Rautio v. Bowen,* 862 F.2d 176, 179 (8th Cir.1988). By the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish

credibility." *Pena v. Chater,* supra at 908; see also, *Lawrence v. Chater,* 107 F.3d 674, 676–77 (8th Cir.1997) (ALJ may discredit complaints that are inconsistent with daily activities); *Clark v. Chater,* 75 F.3d 414, 417 (8th Cir.1996); *Shannon v. Chater,* 54 F.3d 484, 487. Among the daily activities, which counterindicate a disabling condition, are the following: a practice of regularly cleaning one's house, *Spradling v. Chater,* 126 F.3d 1072, 1075 (8th Cir.1997); *Chamberlain v. Shalala,* supra at 1494; cooking, *id.;* and grocery shopping. *Johnson v. Chater,* supra at 944. Although daily activities, alone, do not disprove disability, they are an important factor to consider in the evaluation of subjective complaints. See, *Wilson v. Chater,* 76 F.3d 238, 241 (8th Cir.1996).

b. *Legal Analysis.* The Plaintiff argues that the ALJ failed to properly afford credence to her testimony that she was unable to engage in all work activity. See, *Plaintiff's Memorandum,* at 6. Specifically, the ALJ made his determination, based upon the Plaintiff's daily activities, her perceived lack of incentive to return to work, and her pattern of medical care and treatment. In every pertinent respect, based upon our independent review, we find the ALJ's decision to be fully corroborated by substantial evidence supporting his decision.

The ALJ made express findings as to the Plaintiff's social functioning, her perceived lack of incentive to return to work, and her patten of medical care and treatment, in assessing the credibility of her testimony as to the severity of her impairments. As such, we find no merit to the Plaintiff's argument that, in this case, the ALJ's assessment of her credibility was based on an erroneous review of the Record. We have parsed the entirety of the Record, and conclude that the ALJ's credibility decisions find substantial support.

In her challenge to the ALJ's credibility determination, the Plaintiff first asserts that the ALJ erroneously concluded that her activities of daily living were inconsistent with her alleged limitations. See, *Plaintiff's Memorandum*, at 10. The Plaintiff objects to the ALJ's finding that she was able to perform tasks that were inconsistent with her allegations of total disability. For example, the ALJ noted the Plaintiff's daily activities of working out, bathing, doing laundry, and grocery shopping. [T. 19–20]. Moreover, the Plaintiff took a number of trips, during the period of her claimed disability which, according to the testimony of Dr. Adkins, was atypical for someone suffering from severe depression. [T. 72]. Finally, the Plaintiff did engage in two "romantic relationships" which, according to Dr. Adkins, was also rare for someone who was suffering from severe depression. [T. 73].

In the end, the ALJ determined that the Plaintiff's daily activities did not comport with her assertion of total disability. Of course, a disability claimant need not prove that she is bedridden in order to be considered disabled, see *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir.1999); *Pena v. Chater*, supra at 908; *Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir.1995), but the examples of daily activities, to which the ALJ referred, when taken in conjunction with the other evidence as a whole, including the medical evidence, amply supports the ALJ's determination that her subjective complaints were not fully believable. See, *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir.1999); see also, *Pena v. Chater*, supra at 908 (stating that inconsistencies between subjective complaints of pain and daily living patterns may diminish credibility); *Lawrence v. Chater*, supra at 676–77

(ALJ may discredit complaints that are inconsistent with daily activities).

Next, the ALJ observed that, although Dr. Boutin, as well as the Plaintiff's therapist, recommended that the Plaintiff take antidepressants, which she did for a while,[10] the Plaintiff had declined the medication on a number of occasions. [T. 231, 232, 255, 256, 262, 267, 267, 284, 291, 296, 301, 310, 316, 317, 324, 329–31, 389, 428]. The ALJ appropriately acknowledged that such a failure to seek appropriate medication undermined her assertion that her depression was functionally disabling. See, *Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir.1996) ("We have held that a claimant's failure to take substantial pain medication is 'inconsistent with subjective complaints of disabling pain.' "); *Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir.1994). However, the Plaintiff claims that she has a reasonable explanation for not taking the medication—the fact that she had concerns about their effect given her observations of a medicated close relative, and her belief that the medications were not helping her own condition. See, *Plaintiff's Brief*, at 9.

Nonetheless, antidepressant medication was recommended to the Plaintiff by a physician and by her therapist, see, [T. 231, 232, 244, 255, 256, 262, 265, 267, 284, 291, 296, 301, 310, 316, 317, 324, 329–31, 389, 429, 435], and she received an explanation regarding the effects, and therapeutic levels of the medication, see, [T. 433, 435]. Even though the Plaintiff now expresses concern with the administration of such antidepressants, due to negative side effect she saw in her aunt, see, [T. 435], or because she thought taking such drugs was a sign of weakness, see, [T. 432], she has attempted to take those medications in the past, and she admitted to her therapist

---

**10.** The Plaintiff appears to have tried antidepressant medications for a short time around April of 1996, and again, from December of 1996, or January of 1997, to March of 1997. [T. 41, 62].

that the medications may have helped her state of mind. [T. 262]. We understand the Plaintiff's preference not to administer certain drug therapies, but we consider that preference to conflict with her equally stated adamance that she is totally disabled from working. Accordingly, we find no error in the ALJ's credibility determination as it relates to the Plaintiff's resistance to medications.

Lastly, the ALJ noted that the Plaintiff "did not impress as an individual motivated to return to work." [T. 21]. He based this inference on the Plaintiff's statement, during the Hearing, that she "could not see herself performing assembly work because th[at] would be 'too demeaning' for her." *Id.;* see also [T. 57]. Moreover, the Plaintiff did talk about returning to work on a number of occasions, and there is even a letter from her therapist advising that she was capable of returning to work. [T. 304]. Although the Plaintiff did attempt to resume her job as a customer service manager, with her prior employer, it does not appear, from this Record, that she explored other career opportunities.

The ALJ also noted that the Plaintiff appeared to enjoy a financial position which did not require her to return to work. Specifically, he noted the evidence that she receives as much as $3000 per month in support from her ex-husband, that she rejected a $200,000 offer from her ex-husband, from the sale of his business, that she had a personal trainer, as well as a housekeeper, and that she was financially able to take trips to Mexico, Hawaii, New York City, and Canada, even though not working. [T. 20]. Given this Record, as considered as a whole, there is substantial evidence upon which the ALJ could draw the reasonable inference that the Plaintiff may have not been motivated to return to work.

In sum, we find no error in the credibility findings of the ALJ. While we may not have drawn the same believability determinations, that is not the issue before us, for we find substantial evidence to support those properly drawn by the lawful factfinder—the ALJ.

3. *The Plaintiff's Contention that the ALJ Erred in Relying on the VE's Opinion that the Plaintiff Could Perform a Significant Number of the Positions in the State Economy.*

The Plaintiff contends that the VE's opinion—which the ALJ subsequently adopted as part of his decision—that the Plaintiff could perform a range of available jobs, such as an office helper, a clerical sorter, an assembler, and a hand packer, was not supported by substantial evidence. Specifically, she notes that the United States Department of Labor's Dictionary of Occupational Titles ("DOT"), and the Occupational Outlook Handbook ("OOH"), classify certain of the jobs, which were identified by the VE, as requiring skills beyond her vocational limitations.

a. *Standard of Review.* It is well-settled that, "[w]hen expert testimony conflicts with the DOT, and the DOT classifications are not rebutted, the DOT controls." *Porch v. Chater,* 115 F.3d 567, 572 (8th Cir.1997); see also, *Montgomery v. Chater,* 69 F.3d 273, 276 (8th Cir.1995); *Smith v. Shalala,* 46 F.3d 45, 47 (8th Cir.1995). Nevertheless, the controlling authorities also make clear that "[the Plaintiff's] reliance on the DOT as a definitive authority on job requirements is misplaced, for DOT definitions are simply generic job descriptions that offer 'the approximate maximum requirements for each position, rather than their range.'" *Hall v. Chater,* supra at 259, quoting *Jones v. Chater,* 72 F.3d 81, 82 (8th Cir.1995); see also, *Roe v. Chater,* supra at 678 n. 8; *Carlson v. Chater,* 74 F.3d 869, 871 (8th Cir.1996). In-

deed, as the Court observed, in *Hall v. Chater*, supra at 259, "[t]he DOT itself cautions that its descriptions 'may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities.' " quoting *Roe v. Chater*, supra at 678 n. 8, quoting, in turn, *Dictionary of Occupational Titles, vol. 1*, at xii. "In other words, not all the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." *Id.*

▇▇▇ b. *Legal Analysis.* The ALJ's prescribed RFC assumed that the Plaintiff was limited to working involving only a "brief superficial type of contact with co-workers and supervisors and members of the public as a part of the job task," and also involving "more of a simple, routine, repetitive, concrete, tangible type of a task." [T. 78]. The Plaintiff argues that, according to the DOT, the job of office helper requires an individual who is dependable, and is careful in performing a variety of work activities such as furnishing supplies, opening, sorting and delivering mail, which the Plaintiff claims would require a higher level of interaction with co-workers, and supervisors, than contained in the ALJ's hypothetical question. See, *Plaintiff's Brief*, at 10–11.

According to the Plaintiff, the same would be true for the job of a hand packager, which is performed under close supervision. *Id.* at 11. The Plaintiff claims that the position of office helper, as well as the positions as a clerical sorter, hand packager, and assembler, would require an ability to follow detailed instructions, which is also inconsistent with the Plaintiff's limitations. *Id.* The Plaintiff contends that the position of assembler also

would require a high degree of accuracy and the ability to work at a rapid pace. *Id.* Thus, the Plaintiff maintains that the ALJ erred in concluding that she could perform these jobs because they are supposedly at variance with the DOT's listing for those positions. We disagree.

In response to the hypothetical posed by the ALJ, the VE provided the description of four jobs, including their corresponding identification numbers in the DOT, for which the Plaintiff was suited. According to the DOT, the reasoning level for all of those jobs was a level two, the second lowest level of reasoning development. See, *DOT 209.687–022* (sorter); *DOT 239.567–010* (office helper); *DOT 706.684–022* (assembler, small products); *DOT 920.587–018* (packager, hand). A level two reasoning requires:

> [ The application of] commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

*DOT, Appendix C.*[11]

The ALJ's limitation for the Plaintiff, with respect to an appropriate reasoning level, was that she could perform work which involved simple, routine, repetitive, concrete, tangible tasks. [T. 19–20]. Therefore, the DOT's level two reasoning requirement did not conflict with the ALJ's prescribed limitation. Although the DOT definition does state that the job requires the understanding to carry out detailed instructions, it specifically caveats that the instructions would be uninvolved—that is, not a high level of reasoning. Plainly, the VE's testimony did not contradict the

---

11. *The lowest level of reasoning, level one, requires:*
> [The application of] commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

*DOT, Appendix C.*

ALJ's limitation, when considered in light of the DOT definitions.

In regard to the amount of interaction with co-workers, supervisors, and the public, the DOT reflects that the amount of interaction necessary for an office helper is level six, which requires:

> Speaking–Signaling: Talking with and/or signaling people to convey or exchange information. Includes giving assignments and/or directions to helpers or assistants.

*DOT 239.567–010; DOT, Appendix B.*

It also specifically provides that interaction at this level is "not significant." *DOT 239.567–010.* As for the jobs of a hand packager, assembler, and clerical sorter, the level of interaction is level eight, which is described as follows:

> Taking Instructions—Helping: Attending to the work assignment instructions or orders of supervisor (No immediate response required unless clarification of instructions or orders is needed.) Helping applies to "non-learning" helpers.

*DOT 920.587–018; DOT, Appendix B.*

All three of the jobs specifically state that the interaction is "not significant." See, *DOT 209.687–022; DOT 706.684–022; DOT 920.587–018.* Neither of these levels of interaction would require a continued or even frequent interaction with individuals, and all of the jobs specifically state that interaction is "not significant." Therefore, the VE's testimony, concerning the number of these jobs in the economy did not contradict the level of interaction specified by the ALJ, when considered in light of the specifications outlined in the DOT. Accordingly, the ALJ's reliance on the VE's testimony constitutes substantial evidence.

In sum, finding no basis for a reversal of the ALJ's denial of DIB, we recommend that the final decision of the Commissioner be affirmed in all respects.

THEREFORE, It is—

RECOMMENDED:

1. That the Plaintiff's Motion [Docket No. 6] for Summary Judgment be denied.

2. That the Defendant's Motion [Docket No. 13] for Summary Judgment be granted.

NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than March 5, 2001, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than March 5, 2001, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. § 636 to review the transcript in order to resolve all of the objections made.